STATE of Delaware, ex rel., Richard S. GEBELEIN, Attorney General, Plaintiff Below, Appellant

and

Frank DiMondi, Relator Below, Appellant,

v.

Ernest E. KILLEN, Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted: Nov. 15, 1982.*

Decided: Dec. 20, 1982.

* Supplemental memoranda requested by the Court were filed on November 15, 1982. Argument before the Court *en banc* was held on October 21, 1982.

E. Norman Veasey (argued), William J. Wade and Richard D. Kirk, of Richards, Layton & Finger, Wilmington, for plaintiff and relator, appellants.

Bruce M. Stargatt (argued), and C. Vincent Scheel, of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant, appellee.

Before McNEILLY, QUILLEN, HORSEY and MOORE, JJ., and BROWN, Chancellor, constituting the Court En Banc.

QUILLEN, Justice (for the majority):

## I. Stage of Proceedings

This action was commenced by Attorney General Richard S. Gebelein ("Plaintiff"), on the relation of Frank DiMondi ("Relator"), filing an Information in the Nature of Writ of *Quo Warranto* in the Superior Court. The Superior Court issued a Rule To Show Cause to Ernest E. Killen ("Defendant"), commanding him to respond to the Information. Defendant timely filed a Response to the Information in the Superior Court. The Superior Court certified to this Court two questions of law, and this Court accepted the certified questions.[1]

The Attorney General claims that, by the exercise of the constitutional recess appointment power, the Governor ousted Defendant, Killen, a Commissioner of the Delaware River and Bay Authority, in favor of DiMondi. The defense is that the recess appointment power was not properly used to unseat Mr. Killen because constitutional and statutory holdover provisions protected his right to office against the purported recess appointment. Unfortunately, we deem some preliminary discussion desirable before turning to the two certified questions.

## II. Facts

The material facts are simple and not in dispute.

The Delaware River and Bay Authority (the "Authority") is a bistate agency created by a compact between the States of Delaware and New Jersey, 17 *Del.C.* § 1701, *et seq.* (the "Delaware-New Jersey Compact"). Delaware members of the Authority are appointed by the Governor with the advice and consent of the Senate, 17 *Del.C.* § 1711. Defendant Killen was appointed to serve on the Authority and was commissioned on August 9, 1973. Each member of the Authority is appointed for a term of five years or until a successor has been appointed and qualified. *See* 17 *Del.C.* §§ 1712–14. The stated term of Defendant's service began on July 1, 1973, and ended July 1, 1978.

Relator DiMondi was nominated on January 10, 1979, by the Governor as successor to Defendant. Relator's nomination was submitted for confirmation to the Senate of the 130th General Assembly. The Senate of the 130th General Assembly neither rejected nor confirmed Relator's nomination. The 130th General Assembly went out of existence on November 5, 1980.[2] The 131st General Assembly formally convened on January 13, 1981.

---

1. Under Article IV, § 11(9) of the Constitution of the State of Delaware, the Supreme Court has the following jurisdiction:

   "To hear and determine questions of law certified to it by the ... Superior Court ... where it appears to the Supreme Court that there are important and urgent reasons for an immediate determination of such questions by it. The Supreme Court may by rules define generally the conditions under which questions may be certified to it and prescribe methods of certification."

   The certification procedure is established by Supreme Court Rule 41.

2. In § 4 of the Schedule to the Constitution of the State of Delaware, it is provided: "The terms of Senators and Representatives shall begin on the day next after their election." *See Opinion of the Justices*, Del.Supr., 330 A.2d 764, 766–68 (1974).

On January 6, 1981, Relator was issued a Commission to serve as an Authority member. Relator's appointment is asserted by the Governor to be a recess appointment pursuant to Article III, § 9 of the Delaware Constitution. Relator's nomination was not submitted for confirmation to the Senate of the 131st General Assembly. The 131st General Assembly went out of existence on November 3, 1982. After his stated term expired in 1978, Defendant continued to hold office as a member of the Authority and he still continues to exercise all powers of that office, asserting his authority to do so under Article XV, § 5 of the Delaware Constitution, the holdover provision, as well as under 17 *Del.C.* §§ 1713 and 1714.

### III.  Pertinent Constitutional and Statutory Provisions

The pertinent constitutional and statutory provisions include the following:

(1) Article III, § 9 of the Delaware Constitution in pertinent part:

"He [the Governor] shall have power, unless herein otherwise provided, to appoint, by and with the consent of a majority of all the members elected to the Senate, such officers as he is or may be authorized by this Constitution or by law to appoint. He shall have power to fill all vacancies that may happen during the recess of the Senate, in offices to which he may appoint, except in the offices of Chancellor, Chief Justice and Associate Judges, by granting Commissions which shall expire at the end of the next session of the Senate."

(2) Article XV, § 5 of the Delaware Constitution:

"All public officers shall hold their respective offices until their successors shall be duly qualified, except in cases herein otherwise provided."

(3) 17 *Del.C.* § 1701, article V, and §§§ 1713, 1714 and 1715:

"§ 1701.  Article V Commissioners [in pertinent part].

*Each* Commissioner shall hold office for a term of five years, and until his successor shall have been appointed and qualified .... Any vacancy, however created, shall be filled for the unexpired term only."

"§ 1713.  Holding over of Commissioners.

Each Commissioner from this State shall continue to hold office after the expiration of the term for which he is appointed and until his respective successor is appointed and qualified; but no period during which any such Commissioner shall hold over shall be deemed to be an extension of his term of office for the purpose of computing the date on which said successor's term expires."

"§ 1714.  Successors.

After the expiration of the term of each Delaware Commissioner and each succeeding Commissioner thereafter, the Governor shall, by and with the advice and consent of the Senate, appoint a successor, who shall hold office for a term of 5 years or until his successor has been appointed and qualified."

"§ 1715.  Vacancies.

In the event a vacancy occurs in the office of a Commissioner from this State by death, resignation, removal or otherwise, the Governor shall, by and with the advice and consent of the Senate, appoint a successor, who shall hold office for the unexpired term."

### IV.  The Recess Appointment Power Generally

■ It is noted that the constitutional concept of Senatorial consent to gubernatorial appointments was first introduced in the current Constitution, the Constitution of 1897. Our earlier Constitutions—1776, 1792 and 1831—gave the Governor the absolute appointing power without any requirement of Senate confirmation. Given this chronology, it should also be particularly noted that our recess appointment provision appears to be based on the 1787 federal model and traces the federal language al-

most verbatim.[3] This would suggest, under concepts of statutory construction, that interpretations of the federal constitutional provision, at least those in vogue in 1897, are entitled to great weight. 73 Am.Jur.2d, Statutes, § 334 (1974); *Hill v. Moskin Stores, Inc.,* Del.Super., 159 A.2d 299, 302 (1960), aff'd Del.Supr., 165 A.2d 447 (1960). But a judicial interpretation of a foreign statute, rendered in the foreign forum subsequent to the statute's adoption here, is not entitled to a presumption that the borrowing extended to that subsequent interpretation. *Heckman v. Heckman,* Del. Supr., 245 A.2d 550, 551 n. 1 (1968). Moreover, with regard to State constitutional provisions and United States Supreme Court precedents, the predecessor to this Court said through Judge Rodney in *DuPont v. Green,* Del.Supr., 195 A. 273, 275 (1937):

> "When, however, the Supreme Court of a State is faced with the final construction of a provision of its own Constitution, it becomes imperative that a critical examination be made of the reasoning of any case which, by analogy, might aid in such construction, and this duty exists regardless of the high standing of the Court in which such other decision is rendered."

Thus, while the apparent origin of the language of the recess appointment power should be noted and federal precedents accorded proper respect, it is clearly our duty to exercise an independent judgment.

Turning to two specifics, we focus on the language of the power of the Governor "to fill all vacancies that may happen during the recess of the Senate." It came to our attention that Mr. Killen's stated term expired July 1, 1978. The General Assembly was in session in 1978 on June 30 and recalled by the mutual call of the presiding officers of both Houses immediately after midnight on July 1.[4]

■ While these facts raised the question of whether the vacancy asserted happened during the recess of the Senate or while the Senate was in session, we are satisfied that the moment of origin of the vacancy asserted does not govern the recess power. In this conclusion, we are persuaded by a series of opinions of the corresponding federal provision by various Attorneys General of the United States. Rather, the power extends to a vacancy happening while the Senate is in session and remaining unfilled in a subsequent recess. As United States Attorney General William Wirt wrote in 1823 at 1 Op.Att'y.Gen. 631, 632–34:

> "The substantial purpose of the constitution was to keep these offices filled; and powers adequate to this purpose were intended to be conveyed. But if the President shall not have the power to fill a vacancy thus circumstanced, the powers are inadequate to the purpose, and the substance of the constitution will be sacrificed to a dubious construction of its letter. * * *
>
> Looking to the reason of the case, why should not the President have the power to fill it? In reason, it seems to me perfectly immaterial when the vacancy first arose; for, whether it arose during the session of the Senate, or during their recess, it equally requires to be filled. The constitution does not look to the moment of the origin of the vacancy, but to the state of things at the point of time at which the President is called on to act. Is the Senate in session? Then he must make a nomination to that body. Is it in

3. The recess appointment power in the Constitution of the United States is found in Article II, Section 2 and reads as follows:

"The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."

4. Article II, § 4 of the Constitution now provides:

"The General Assembly may continue in session each calendar year so long as, in its judgment, the public interest may require; however, each session shall not extend beyond the last day of June unless the session is recalled by the Governor or the mutual call of the presiding officers of both Houses."

recess? Then the President must fill the vacancy by a temporary commission. * *

The opposite construction is, perhaps, more strictly consonant with the mere letter. But it overlooks the spirit, reason, and purpose; and, like all constructions merely literal, its tendency is to defeat the substantial meaning of the instrument, and to produce the most embarrassing inconveniences."

*See also United States v. Allocco,* 2d Cir., 305 F.2d 704, 712–14 (1962), cert. denied 371 U.S. 964, 83 S.Ct. 545, 9 L.Ed.2d 511 (1963) and II Debates and Proceedings of the Constitutional Convention of the State of Delaware 1320–21 (1958).

Secondly, while it is not necessary to define "recess" in any comprehensive fashion, the parties are in agreement that the period between the day after the election in 1980 and the convening of the newly elected General Assembly in January 1981 constituted a recess. We agree and this conclusion is confirmed by an opinion construing the federal Constitution rendered by United States Attorney General Knox on December 24, 1901, close to the time of the adoption of our constitutional provision. 23 Op.Att'y.Gen. 599.[5]

Thus, with regard to the recess appointment of Mr. DiMondi, as we see it, the crucial time is the time the Governor acted and, at that time, January 6, 1981, the Senate was in recess.

### V. Relator's Status

#### The Second Question Certified

■ There is no dispute as to the second question certified. The question is:

"2. Where a gubernatorial appointment was made and a Commission issued on January 6, 1981 pursuant to Delaware Constitution Article III, § 9 to fill a vacancy purportedly happening during a recess of the Senate, did not that Commis-

sion expire at the end of the next session of the Senate?"

Assuming that Mr. DiMondi was properly appointed, everyone now concedes that his commission expired "at the end of the next session of the Senate". *State ex rel. Satterthwaite v. Stover,* Del.Super., 159 A. 239 (1932). Thus the answer to the question is yes; assuming the appointment was valid when made, it has now expired.

■ Mr. DiMondi is no longer a party in interest and, on remand, he should be removed as a party. But Relator's lack of standing does not preclude the Court's consideration of this matter. The Attorney General may proceed alone. A *quo warranto* action is of a public, not private nature. The Attorney General is the defender of the public interest and has standing to bring an action to protect the public from the alleged usurpation of a public office. *Hampson v. State ex rel. Buckson,* Del.Supr., 233 A.2d 155, 157 (1967); *Cleaver v. Roberts,* Del. Supr., 203 A.2d 63, 68 (1964); *State ex rel. Green v. Glenn,* Del.Super., 4 A.2d 366, 367 (1939).

■ The question remains as to whether Mr. DiMondi at one time had a valid term which divested Mr. Killen of his office as an Authority member. Thus, a question requiring the interpretation of the pertinent constitutional and statutory provisions pertaining to the right to fill that office remains ripe for decision. *Compare State ex rel. Craven v. Shaw,* Del.Super., 126 A.2d 542, 552 (1956), aff'd *sub nom. State ex rel. Craven v. Schorr,* Del.Supr., 131 A.2d 158, 164 (1957).

### VI. Defendant's Right to Office

#### The First Question Certified

We come at last to the heart of the matter which is put to us in a rather awkward compound question.

---

5. Later opinions of United States Attorneys General expand the definition of recess to include some adjournments within a session. See 33 Op.Att'y.Gen. 20 (1921); 41 Op.Att'y. Gen. 463 (1960). Note this has the effect of making a recess appointment extend for two sessions of the Senate, the one during which the appointment is made and the "next" one. We render no view as to these later opinions of the United States Attorneys General.

"1. May the Governor of the State of Delaware, while the Senate is in recess, exercise the recess appointment power granted under Article III, § 9 of the Delaware Constitution and issue an interim commission to fill a position on the Delaware River and Bay Authority where the statutory term of an incumbent has expired, or do the 'holdover' provisions of Article XV, § 5 of the Delaware Constitution preclude the effective exercise of such recess appointment power where said incumbent holds over under the provisions of 17 *Del.C.* §§ 1713 and 1714 until his successor is appointed and qualified?"

The Plaintiff argues that the expiration of the stated statutory term of office created a vacancy for appointment purposes even though the official "holds over" under Article XV, § 5. Therefore, since a vacancy existed, it could be filled by the Governor through the recess power granted to him in Article III, § 9. Thus, he argues that, even though Relator's commission under the recess power has expired and the office is now vacant, the Relator's recess commission qualified him as a successor and terminated the Defendant's holdover privilege.

The Defendant argues that the expiration of a statutory term does not create a vacancy in the office and, therefore, the Governor was without recess authority to commission Relator. Thus, Defendant contends that he constitutionally continues in office under the holdover provision. Additionally, he argues that the wording of the statutes creating the River and Bay Authority precludes the finding of a vacancy at the expiration of a term and, further, that if a vacancy were to be found, those statutes require that it could be filled only with the consent of the Senate.

a. The dimensions of the argument

While the instant certified question does not raise every conceivable issue in the appointment process, it is important to note that the argument puts the Judiciary in the middle between the Executive and Legislative branches in a situation where there is a potential for abuse on both sides. On the one side, if the Governor can use his recess appointment power notwithstanding the holdover provision, he could be tempted to avoid the Senate altogether by making appointments only during the recess of the Senate. Such action on his part would be an avoidance of a duty to respect the Senate's constitutional prerogatives and an abuse of power. On the other hand, given a holdover more acceptable to the Senate than the nominee of the Governor, the Senate can avoid its responsibility, as it did in this very case, by taking no action on the nominee. Such a course is also an abuse of power. It is not the equivalent of a rejection because there is not the accountability of a vote. It is simply the avoidance of a constitutional duty.

These risks have long been recognized by constitutional observers. In 1823, the Attorney General of the United States, William Wirt, opined that the recess power extended even to a vacancy which had its origin while the Senate was in session. He said:

"The construction which I prefer is perfectly innocent. It cannot possibly produce mischief, without imputing to the President a degree of turpitude entirely inconsistent with the character which his office implies, as well as with the high responsibility and short tenure annexed to that office; while, at the same time, it insures to the public the accomplishment of the object to which the constitution so sedulously looks—that the offices connected with their peace and safety be regularly filled."

1 Op.Att'y.Gen. at 634. Chief Justice Roger B. Taney when he was Attorney General in 1832 was even more emphatic:

"He may fill up vacancies which 'happen' during the recess. But vacancies are not *designedly* to be kept open by the President until the recess, for the purpose of avoiding the control of the Senate. And the word 'happen' is used to describe the class and kind of vacancies, and not

the particular time at which they took place.

. . . . .

It has been said that this power, if possessed by the President, may be so used as to defeat the intention of the constitution, and exclude the Senate from all share in appointments. The answer to such an objection appears to be a plain one. If the President wilfully abuses a power given to him, the constitution has provided a remedy. . . ."

2 Op.Att'y.Gen. 525, 528–29. It should be noted that constitutional debates on our current 1897 Constitution clearly indicate that recess appointments are to be followed by regular nominations at the next session of the Senate. III Debates and Proceedings of the Constitutional Convention of the State of Delaware 1902, 1972 (1958). Presumably the Governor's failure to submit a regular nomination after the purported recess appointment in this case was due to the uncertainty as to the validity of the recess appointment.

And, lest the machinations of the Senate be deemed new, reference again can be had to Mr. Taney's 1832 justification of a recess appointment:

"In this case, the Senate have had a full opportunity of acting, but have not acted, and have held the nomination under advisement, and left it to fall vacant as soon as they adjourned. They must be supposed to have had sufficient reasons for keeping the nomination in their power, and suspending their action upon it. The President could not nominate another person for the same office until this was disposed of, and was either withdrawn by him or finally acted on by the Senate. And as the Senate have had an opportunity of acting, but have determined to suspend their decision, I cannot see how an appointment now made by the President can be supposed to interfere with the rights of the Senate. There is nothing in the case that can be construed into a desire to avoid their constitutional control."

2 Op.Att'y.Gen. at 529. Similarly, Attorney General Knox's 1901 opinion has a rather current ring:

"It may be that Congress might 'temporarily adjourn' for several months as well as several days, and thus seriously curtail the President's power of making recess appointments. But this argument from inconvenience, like the argument against a power because of its possible abuse can not be admitted to obscure the true principles and distinctions ruling the point."

23 Op.Att'y.Gen. 599, 603.

The constitutional duty of the Senate to act on gubernatorial nominations seems clear.[6] And, notwithstanding the absence of precedent and the failure of oral argument in this case to suggest an enforcement mechanism, we are not called upon to foreclose and we do not foreclose the possibility that the judicial branch has the power to enforce the duty, at least on a case by case basis, when the claim is promptly made and diligently pursued. For example, one remedy that could be considered in a given case, would be that the Senate's willful and prolonged avoidance of its constitutional duty to confirm a qualified nominee may be deemed an assent to the nomination and the equivalent of a confirmation. *See also* question 4b in the *Opinion of the Justices,* Del.Supr., 405 A.2d 694, 695 (1969) suggesting lack of action results in a vacancy. Admittedly, Courts have traditionally refrained from such activity, *Gilbert v. Gladden,* N.J.Supr., 87 N.J. 275, 432 A.2d 1351 (1981), *Passaic County Bar Association v. Hughes,* N.J.Super., 108 N.J.Super. 161, 260 A.2d 261 (1969), but, in instances of patent abuse, Courts have filled the gap in related

6. During discussion of Article III, § 9 appointment power, one Constitutional Convention delegate stated that "[I]t is his [the Governor's] duty at that session [the next session after the recess] to nominate and the Senate to confirm the appointment." III Debates and Proceedings of the Constitutional Convention of the State of Delaware 1902 (1958). Presumably, this comment was not intended to foreclose the possibility of rejection.

areas. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). This Court, which particularly has a strong tradition of judicial restraint, said in *Henry E.I. duPont v. Director of the Division of Revenue of the Department of Finance,* Del.Supr., 347 A.2d 653, 656–657 (1975):

"Over the years the Delaware Courts have recognized the broad powers conferred on the General Assembly by the Constitution and, indeed, it has been said that the legislative power 'is as broad and ample in its omnipotence as sovereignty itself,' *Collision v. State,* Del.Supr., 9 W.W.Harr. 460, 2 A.2d 97 (1938); *State v. Shaw,* Del.Super., 11 Terry 193, 126 A.2d 542 (1956), aff'd, 11 Terry 365, 131 A.2d 158 (1957). The administration of that power by the Assembly is specifically permitted by Art. II, § 9 which provides that '[e]ach House may determine the rules of its proceedings, ... and shall have all other powers necessary for a branch of the Legislature of a free and independent State.' In sum, broad substantive and procedural powers are vested in the General Assembly by our Constitution and, for that reason, Delaware Courts have traditionally deferred to the legislative body in matters involving the conduct of its business and the law-making process. But it does not follow that all legislative procedures are beyond judicial scrutiny. We say this because the power of the Assembly, like that of the Governor and the Courts, is subject to constitutional restrictions, whether express or necessarily implied. *State v. Shaw,* supra, and, in an appropriate case, it is the duty of the Court to define such restrictions. Here, relief is not available to plaintiff but the General Assembly should take notice of the legal attack on its notice procedures, particularly in light of evolving judicial concepts."

The potential abuses are mentioned because they demonstrate the duties of the two branches and the extended dimensions of this argument. This Court is being thrust into the middle of a stew not of our making. We must assume that all will act in good faith and with a prime regard for constitutional duty.

We have taken care to see to it that an issue is particularly defined and arises in the context of a specific case. *Opinion of the Justices,* Del.Supr., 405 A.2d 694, 700–01 (1979); *Opinion of the Justices,* Del.Supr., 424 A.2d 663, 664 (1980). Out of caution, we note that we now have a specific case which has been contested before us on a single certified question. The attack here is broad and singular. It is claimed that there can be a recess appointment to an office properly occupied by a holdover. There is no claim here based on the behavior of the Senate. Thus, the disposition of the limited appeal in this case cannot by its nature cover the entire spectrum of duties, rights and remedies.

#### b. The federal precedents

It seems clear under the line of federal precedents to which reference has been made that a recess appointment can be made upon the expiration of a stated term. But there is no provision in the Constitution of the United States providing that public officers shall hold their offices until their successors shall be qualified and this is a fundamental difference. In *Staebler v. Carter,* D.C.D.C., 464 F.Supp. 585 (1979), cited by the Relator as containing an exhaustive review of the law on this topic, the district court found that a *statutory* holdover provision, contained in the Federal Election Campaign Act at 2 *U.S.C.* § 437c(a)(2)(B), could not be construed to limit the President's constitutional recess power and that even if the statute were so intended, such an attempt would produce an "almost certainly unconstitutional result." *Id.* at 591.

In *Staebler,* the holdover incumbent, a member of the Federal Election Commission, had contended that the statutory holdover provision limited the exercise of the recess appointment power and, further, that the terms of the statute provided for appointment only with senatorial consent. The Court determined, assuming *arguendo*

that the incumbent's assertions were correct, that such a broad construction of the statute would result in an unconstitutional constraint on the recess appointment power. Further, it found that an examination of the language of the statute did not support that interpretation of legislative intent.

The Court reinforced its conclusion through the use of secondary materials: legislative history, state court decisions, past executive custom and practice, and constitutional purpose and scheme. It said that the legislative history of the statute did not provide significant information and that the state court decisions were too inconsistent to be persuasive. However, the Court found that a history of executive practices was somewhat helpful although in prior exercise of the recess power this precise situation had rarely been encountered. The Court noted these prior recess appointments had previously gone unchallenged by the Senate and generally resulted in ultimate confirmation.

Finally, and most pivotal, the Court considered the relationship of the statute to the purpose of the constitutional recess appointment clause and the constitutional system of checks and balances. The incumbent had argued that the recess appointment clause was designed to operate only when no person was available to occupy an office, that its sole purpose was to prevent a hiatus in public functions. However, the Court was persuaded that the framers did not intend this clause to have subordinate standing in the constitutional scheme as a lesser method of appointment. It found that any intent on the part of the framers to limit the operation of the power was clearly expressed in the restrictions contained in the clause itself. "[T]hey [the limitations] may be presumed to express the view of the framers concerning the degree to which the executive authority in this area was to be circumscribed. There is no justification for implying additional restrictions not supported by the constitutional language." *Ibid.* at 597.

The Court concluded that the constitutional scheme of checks and balances favored the Executive regarding this particular statute, not only because of the primary role of the Executive in appointments but also because this statute created a "most sensitive" political body. Further, validation of the right of a holdover commissioner would upset the carefully designed statutory scheme and the executive branch would be without constitutional means to protect its powers from Congressional usurpation.

We can readily determine that the premises for the *Staebler* decision are entirely absent in this case. We are not examining the effect of a statutory limitation on a constitutional power. We are evaluating the effect of two constitutional provisions which must be reconciled if reasonably possible. To repeat the summary of the law contained in the *Opinion of the Justices,* Del.Supr., 330 A.2d 764, 766–67 (1974):

"As was stated in *State v. Roberts,* Del.Supr., 282 A.2d 603, 606 (1971): 'Cardinal are the rules that the Constitution and each part thereof must be harmonized and construed as a whole; that it cannot be presumed that any clause of the Constitution is intended to be without full force and effect.' And in *Opinion of the Justices,* Del., 225 A.2d 481, 484 (1966), the controlling precepts are stated as follows:

'The applicable rules of construction require that effect be given, if possible, to the whole Constitution and to every word thereof. If different portions of the Constitution seem to conflict, they must be harmonized if possible. That construction must be favored which will render every word of the instrument operative; and that construction must be avoided which would make any provision idle and nugatory. Every provision of the Constitution must be construed, whenever possible, to give effect to every other provision. Otherwise stated, whenever avoidable, no constitutional provisions should be so construed as to nullify, or substantially impair, any other constitutional provision or to produce an irrational result.'"

The framers of our Constitution clearly displayed an intent to affect expired terms by enacting Article XV, § 5. One effect could limit the recess appointment power found in Article III, § 9. Just such a limiting effect was noted by this Court in *State ex rel. Satterthwaite v. Highfield,* Del. Supr., 152 A. 45, 52, n. 1 (1930), although further analysis was not necessary to the decision in that case.

Thus, on the crucial issue, the federal precedents, which arise in a context without a constitutional holdover provision, are simply not helpful.

#### c. Construction

It remains to construe the interrelationship of the recess power and the holdover power. We come at that task through three tacks: a general view of the vacancy concept; the vacancy concept based on the language of the Constitution; and the vacancy concept as construed by the Court. Each of these overlapping approaches leads us to the conclusion that the recess power was not intended to be exercised for an office occupied by a holdover appointee. In making this determination we emphasize that we are not writing on a blank slate. Our view of the best policy does not govern.[7] The ruling must come from the interrelationship of concepts set forth in the

Constitution, the language of the Constitution, and the prior case law that has construed the Constitution.

#### 1. Construction Vacancy generally

The function of the recess appointment power must be viewed in light of the purpose for which it was created. The Constitution of 1897 severely curtailed the Governor's right to appoint to public offices. As noted above, our earlier Constitutions—1776, 1792 and 1831—gave the Governor the absolute appointing power without any requirement of Senate confirmation. At the Constitutional Convention of 1897 this limitation of appointment power had near unanimous approval although there was substantial debate as to the proper majorities for Senate consent.[8] Thus, there is, as appears uncontested, a "constitutional norm" for appointment with approval from the Senate.[9]

The Article III, § 9 recess clause is a specific exception to this norm and therefore must be strictly interpreted to harmonize not only with the "norm" but also with the other provisions of the Constitution. *See* 2A Southerland Statutory Construction § 46.05 (4th ed. 1973).

The Governor's authority to exercise the recess appointment power granted in Arti-

---

7. We do not find the policy argument all on one side. If a deadlock developed between the Governor and the Senate, it is not clear to us that State government would be best served by a series of recess appointments expiring at the end of each session of the Senate. On the other hand, we recognize the Governor's role as the customary appointing authority and chief executive officer. It may not be in the best tradition of public service for a subordinate executive officer to remain in office over four years after his term has expired contrary to the wishes of a Governor who has been elected and re-elected.

8. *See,* e.g., II Debates and Proceedings of the Constitutional Convention of the State of Delaware 944–956, 1315, 1320–21 (1958); III Debates and Proceedings of the Constitutional Convention of the State of Delaware 1898–1900 (1958).

9. *See* II Debates and Proceedings of the Constitutional Convention of the State of Delaware

1315–16 (1958) where William C. Spruance said:

"... We have, after much consideration, recognized the fact that it is desirable that the Governor shall not have the sole power of appointment of public officers, but that a wholesome check upon improper appointments shall be established by requiring confirmation by the Senate. That was recognized in the report of the Judiciary Committee in respect to all our Judges.

Following out that idea, I see that in some of our neighboring states all appointments by the Executive—for instance, in Pennsylvania—all appointments by the Executive where the salary or compensation amounts to more than $300 a year—and perhaps there is another test, but I am told that is one of them—has been made by confirmation by the Senate. That is a good and wholesome thing, and it does away with all ground of complaint about the arbitrary or unwise action of a single man."

cle III, § 9 is premised upon the existence of a vacancy in a public office. A vacancy is "prerequisite to any exercise of the Governor's power under Article III, § 9 . . . ." *Opinion of the Justices,* Del.Supr., 352 A.2d 406, 408 (1976). The words of Article XV, § 5, the holdover provision, have bearing on the determination of whether such vacancy exists. "All public officers shall hold their respective offices until their successors shall be duly qualified, except in cases herein otherwise provided."

■ The plain purpose of both Article III, § 9 and Article XV, § 5 is to prevent public offices from becoming unoccupied and being without an incumbent to perform the public duties. *State ex rel. Satterthwaite v. Stover,* 159 A. at 244; *Walker v. Hughes,* Del.Supr., 36 A.2d 47, 50 (1944); *State ex rel. Southerland v. Caulk,* Del.Super., 138 A. 354, 357 (1927). If "vacancy" is defined as a condition created by the expiration of term, the Governor would have a recess power to appoint. However, such a definition calls into question the purpose of Article XV, § 5 since that section gives an incumbent the legal right to remain in office at expiration of term when no successor is qualified. The incumbent continues as a constitutionally sanctioned *de jure* officer.

■ This situation is to be distinguished from what occurs if a properly appointed recess officer continues in office after the adjournment of the Senate. He loses *de jure* status because he has no legal right to continue in office and his position, though not absolutely, or physically, vacant, is constructively vacant because there is no lawful incumbent.[10] *State ex rel. Satterthwaite v. Stover,* 159 A. at 244.

■ Thus, it appears to us that the Constitution provided for continued occupancy of office in two ways, the first automatically by Constitutional provision and second, in the greater emergency, when even the automatic extension of term did not fill the gap. The second was to be used only on the failure of the first.

### 2. Intrinsic construction
### Vacancy as a constitutional term

In determining the meaning of the term "vacancy", we look next to the language of the Constitution itself. Article III, § 9 provides two separate grants of power to the Governor to fill public offices:

"He shall have power, unless herein otherwise provided, to appoint, by and with the consent of a majority of all the members elected to the Senate, such officers as he is or may be authorized by this Constitution or by law to appoint. He shall have power to fill all vacancies that may happen during the recess of the Senate, in offices to which he may appoint,

10. Relator has urged this Court to find that Mr. DiMondi's office is "constructively" vacant, asserting that the language in *State ex rel. Satterthwaite v. Stover,* Del.Supr., 159 A. 239 (1932) requires such an interpretation. However, *Stover* merely referred to three types of vacancies in the context of a discussion of an office which had, at different times, fulfilled all three definitions. Judge Rodney paraphrased authorities which defined an "original" vacancy as one in a newly created office, an "absolute" vacancy as one in an office where there was no one "in esse" to discharge the duties, and a "constructive" vacancy as one in an office which was occupied by an incumbent who "has no legal right or claim to continue . . . but [who] can be legally replaced by another functionary." *Id.* at 241. In *Stover,* Judge Rodney determined that a recess appointee had no legal right to continue after adjournment of the Senate as a result of the limiting language of the Article III, § 9 recess power clause. Therefore, although a proper recess appointee enters office as a *de jure* officer, he becomes a *de facto* officer if he continues after adjournment. *See Walker v. Hughes,* Del.Supr., 36 A.2d 47, 50 (1944). The office however is constructively vacant because he has no legal authority to remain. A constitutional holdover appointee is distinguishable. He is a *de jure* occupant: he enters office lawfully and continues in office after expiration of term and adjournment of the Senate by virtue of the authority of Article XV, § 5. The recess power does not qualify under the "except in cases herein provided" proviso because it is contingent upon a vacancy and the holdover section prevents a vacancy. Rather the proviso can be given meaning by the fact that constitutional judges do not hold over due to Article IV, § 3. *See infra,* part VI–c–2.

except in the offices of Chancellor, Chief Justice and Associate Judges, by granting Commissions which shall expire at the end of the next session of the Senate."

Although the federal authorities tend to ignore the precise language, given our constitutional holdover provision, we think it is significant that the Governor's regular power to appoint is not limited by the concept of a vacancy. Rather it is expressed in terms of a "power ... to appoint" as authorized by the Constitution or law. His recess appointive power is, however, limited "to fill all vacancies". Thus, as to the regular power, it is clear that he can appoint on the expiration of a term, notwithstanding a holdover occupant and the holdover incumbent can be divested when the Senate consents. It does not follow, however, that, merely because a holdover officer is subject to being divested by a successor appointed and confirmed in regular course, that he is also subject to being divested by a recess appointment. A distinction is made by the constitutional language in Article III, § 9 standing alone.

The language of the recess power also draws our attention to the express exception for constitutional judicial offices. The special provision for such offices is found in Article IV, § 3, which reads in pertinent part:

"If a vacancy shall occur, by expiration of term or otherwise, at a time when the Senate shall not be in session, the Governor shall within thirty (30) days after the happening of any such vacancy convene the Senate for the purpose of confirming his appointment to fill said vacancy and the transaction of such other executive business as may come before it. Such vacancy shall be filled as aforesaid for the full term."

It is significant that, in this special context, the constitutional framers thought it necessary to define the concept of vacancy by adding the qualifying words "by expiration of term or otherwise". The clear inference is that expiration of a judicial term would not otherwise cause a vacancy to happen.[11]

■ The word "vacancy" is used in various constitutional provisions but these are not particularly helpful in reference to the instant problem.[12] We are left with the conclusion from the constitutional language above that the recess power "to fill vacancies" was not designed to permit appointments on the mere expiration of stated terms. Thus, since expiration of term does not create a vacancy, the Article III recess power cannot be exercised and a successor cannot be "duly qualified" under Article XV, § 5 to terminate the holdover's right to office.

### 3. Extrinsic construction

#### Vacancy as construed

We think our reading of the Constitution, both conceptually and literally, is consistent with past judicial construction.[13] In *Opin-*

11. It is interesting to note that the judiciary was also excepted from the recess appointment power. This exception for the judiciary was in part premised on the fear that a judge who was appointed when the Senate was not in session might use the intervening time to solicit political support for confirmation by getting "eminent lawyers to prepare his opinions, when he could give entire satisfaction in the discharge of his duties as Judge, when he could build up a coterie of friends around him to pass upon his confirmation ...." II Debates and Proceedings of the Constitutional Convention of the State of Delaware 944 (1958).

12. *See* Art. II, § 6 (General Assembly vacancies); the balance of Art. III, § 9 (elective office vacancies); Art. III, § 20 (executive vacancies);

Art. IV, § 12 (vacancies for Supreme Court quorum purposes); Art. IV, § 37 (vacancies by action of Court on the Judiciary); Art. XI, § 3 (State Board of Agriculture vacancies); Art. XVI, § 2 (Constitutional Convention delegate vacancies).

13. Some comment of modest help exists in the Constitutional Debates. In a discussion of the Governor's power to appoint to elective office when a vacancy occurs, the Article III, § 9 power was held to have "reference to a vacancy caused in some other way than by the expiring of the term." V Debates and Proceedings of the Constitutional Convention of the State of Delaware 3283 (1958).

During a discussion of succession to the offices of Governor and Lieutenant Governor, it was

*ion of the Justices,* Del.Supr., 189 A.2d 777, 778–79 (1963), in reference to Article IV, § 3, judicial appointments, this Court stated:

> "The term 'vacancy', as used in our Constitution in connection with public offices, ordinarily means 'that the office is unoccupied and without an incumbent, who has a legal right to continue therein until the happening of some future event.' There is ordinarily no 'vacancy' on expiration of term because 'Section 5 of Article 15 was apparently enacted for the very purpose of preventing a possible vacancy or interregnum in an office where there [is] not a properly qualified successor at the expiration of the usual statutory term of such office.' *State v. Caulk,* 3 W.W.Harr. 344, 351, 33 Del. 344, 351, 138 A. 354, 357.

This is the general rule. But we are of opinion that Section 3 of Article IV, above quoted, creates an exception to it. It is plain from the express language of this section that the expiration of the term of a constitutional judge is deemed to be a 'vacancy'. The inference, therefore, is that when the term of a constitutional judge expires his office is vacant."

In *State ex rel. Satterthwaite v. Stover,* 159 A. at 244, the Court held that a recess appointee did not hold over and could serve as a *de jure* officer only until the expiration of his Commission at the end of the next session of the Senate. The following language in the opinion supports our view of Article III, § 9:

> "Under article 3, § 9, there is vested in the Governor a general grant of power to appoint to office and also a special grant of appointing power. The general grant is vested in the Governor acting with the consent of the majority of the members elected to the Senate. The special grant is restricted to filling for a limited time vacancies occurring during the recess of the Senate and was made to avoid the inconvenience to the public service which would arise from leaving offices vacant during the interval which might elapse before the re-assembling of the Senate— the coordinate branch charged with the duty of approval or consenting to appointments. One fundamental principle is that in the filling of public offices where the compensation is over $500 the sovereign people acting through the confirmation by the Senate have a right to a voice in the selection of proper persons as public officers and when a vacancy is caused by the death or resignation of a person so approved by the Senate then this right to a voice in the final selection of a successor should be restored at the earliest proper time." *Id.*

Further, in *State ex rel. Southerland v. Caulk,* 138 A. at 357, the Court considered the juxtaposition of Article III, § 9 and Article XV, § 5 in relation to an elected office:

> "The material question to consider, therefore, is whether there was a vacancy in the office in dispute at the expiration of Mr. Hart's term. In determining this question, section 5 of article 15 of the Constitution must, also, be read in connection with section 9 of article 3. The word 'vacancy,' as applied to a public office, ordinarily has no peculiar or technical meaning, and there is nothing to

---

clearly contemplated that a provision for holdover until a successor was duly qualified prevented vacancies in those offices:

> "We have a great long provision in our Constitution about what shall be done when there is a contested election of the Governor or Lieutenant-Governor and when it shall be protracted beyond a certain period, and all that sort of thing. We wind all that up by *having a general provision* under this section that his successors shall be duly qualified; not elected, because his successor may be a

person not elected, but however constituted the office is not vacated until his successor is duly qualified.

> In other words, it is to guard against a vacancy in the office of Governor. I have found it in other Constitutions and have thought about it carefully, and I think it is not only a safe, but a very necessary provision."

III Debates and Proceedings of the Constitutional Convention of the State of Delaware 1892 (1958).

indicate that it was not used in its ordinary and usual sense in the Constitution of 1897.

In that sense, the word 'vacancy' means that the office is unoccupied and without an incumbent, who has a legal right to continue therein until the happening of some future event. [citations omitted]

Section 5 of article 15 was apparently enacted for the very purpose of preventing a possible vacancy or interregnum in an office where there was not a properly qualified successor at the expiration of the usual statutory term of such office. [citations omitted]

. . . . .

It is true that the four year term for which Mr. Hart was elected would have expired in January of the present year if the law had provided for the election of his successor in November of 1926; but where there is an express constitutional provision that all public officers shall hold their respective offices until their successors shall be duly qualified, as in section 5 of article 15, the mere expiration of the usual statutory term does not create a vacancy if there is a person who has the lawful right to perform the duties of such office."

Moreover, in *Walker v. Hughes,* Del. Supr., 36 A.2d at 50, the constitutional holdover provision was discussed in the context of a holdover whose re-election was contested. The Court noted in part:

"In a proper case he holds de jure in the full sense of the term and is entitled to the emoluments of the office as of right, as, for example, where there has been no election of a successor, or where a duly elected successor is disqualified to hold the office."

Finally, such an interpretation is in accord with the meaning given the term "vacancy" in paragraphs two and three of Article III, § 9 relating to appointments to elective office in *State ex rel. Satterthwaite v. Highfield,* Del.Supr., 152 A. 45 (1930). In that case the term "vacancy" was construed as meaning an event occurring during an unexpired term of elective office. The Court reasoned:

"While regular biennial general elections were provided for, the framers of the Constitution naturally realized that interruptions in its general scheme, with respect to offices, would necessarily occur from time to time, by reason of death, removal, resignation and the like, and at times when the vacancies caused thereby could not be immediately filled in the regular manner." *Id.* at 50–51.

Prior Delaware case law thus clearly dictates there is no vacancy on the mere expiration of a term. Case law from other jurisdictions construing similarly worded holdover provisions supports our conclusion that these provisions prevent a vacancy from arising at expiration of term. *See Zemprelli v. Thornburgh,* Pa.Cmwlth., 55 Pa.Cmwlth. 330, 423 A.2d 1072, 1077 (1980), construing a statutory holdover provision; *State ex rel. McCarthy v. Watson,* Conn. Supr., 132 Conn. 518, 45 A.2d 716, 721–22 (1946), construing statutory provisions. *See also* cases collected in Anno.—Vacancy in Office, 164 A.L.R. 1248 (1946) and in the Governors' Constitutional Powers of Appointment and Removal, 22 Minn.L.Rev. 451, 461–2 (1938), which cites eighteen states which have found that no vacancy is created by expiration of term as opposed to nine states which found vacancy at such expiration.

On July 1, 1978 no qualified successor to Mr. Killen's office existed and, he therefore, had lawful title to continue in office. No vacancy arose. Any other construction of the term vacancy would nullify the legal effect of Article XV, § 5. Further, this construction integrates the purposes of Article III, § 9 and Article XV, § 5 with the underlying constitutional norm of senatorial consent to gubernatorial nominations. Where there is no approved official "in esse" to holdover (Article XV, § 5) and the consent of the Senate cannot be acquired (Article III, § 9), the Governor has the exceptional and limited authority to act

alone to see that the public duties are discharged, by granting a temporary commission to a person whose authority exists only until the Senate has an opportunity to consent.

We think that this resolution is precisely that intended by the framers. In *People ex rel. Baird v. Tilton,* Cal.Supr., 37 Cal. 614, 621 (1869), the Court discussed a constitutional appointment power and offered a rationale against finding a vacancy when a holdover was available:

> "It was manifestly the intent of the Constitution that the Governor should appoint only where there is no party authorized by law to discharge the duties of the office. The object was to prevent a public inconvenience arising from the want of a party authorized for the time being to discharge the duties of a public office. When there is a party expressly authorized by law to discharge those duties temporarily, till the power upon whom the duty of election, or appointment, is devolved can regularly act, there is no occasion for calling into exercise this extraordinary power vested in the Governor to make a merely *temporary* appointment. There is no good reason for appointing a party to temporarily discharge the duties of an office when there is already a party expressly authorized by the Constitution, or laws to temporarily discharge those duties. The very reason upon which the power is vested in the Governor fails, and the case provided for has not arisen. And it can make no difference whether the language expressly authorizing a party to hold over and discharge the duties of an office temporarily till a successor duly elected and qualified appears, is found in the Constitution, or in the statute."

We feel that a similar intent is manifest here. *See also State ex rel. Satterthwaite v. Highfield,* 152 A. at 52.

#### d. The statutory argument

Although courts will usually decline to reach a constitutional question if a decision can be reached on other grounds, *Collison v. State ex rel. Green,* Del.Supr., 2 A.2d 97, 108 (1938); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurrence), such an approach is not available here. The effect of 17 *Del.C.* § 1701 *et seq.* unavoidably requires an exploration of the reach of the Article III, § 9 power. Thus, we have not been hesitant to go directly to the broader constitutional issue involving the holdover provision. This approach is also easier in our view.

■ A constitutional power, if not self-limiting, may be limited only by other provisions in the same instrument. *See State ex rel. James v. Schorr,* Del.Supr., 65 A.2d 810, 812 (1949); *State ex rel. Morford v. Emerson,* Del.Super., 8 A.2d 154, 160 (1939); *Collison v. State ex rel. Green,* 2 A.2d at 101. It can thus be argued that the preeminence of the constitutional authority nullifies defendant's debatable argument that these statutory provisions relied upon require Senatorial consent for every appointment. Doubtful statutory limitations on the exercise of that power could be construed to avoid constitutional questionability. *Opinion of the Justices,* Del.Supr., 295 A.2d 718, 721–22 (1972); *Collison v. State ex rel. Green,* 2 A.2d at 103. But the Article XV, § 5 holdover provision, in our view, requires a finding for a holdover incumbent. Therefore, it is better to proceed directly to the constitutional concepts which we have found decisive. An examination of the defendant's statutory arguments is, therefore, unnecessary. *Compare Staebler v. Carter,* D.C.D.C., 464 F.Supp. 585 (1979) and *People ex rel. Baird v. Tilton,* Cal.Supr., 37 Cal. 614 (1869).[14]

---

14. This is not to suggest that the statutory argument is without some merit. If "the legislative power *is as broad* and ample in its omnipotence as sovereignty itself" [*Collison v. State ex rel. Green,* 2 A.2d at 100], the General Assembly may well have the right to define when a vacancy exists in a statutory office or to effect the appointive power. *Collison,* 2 A.2d at 101; *State ex rel. Morford v. Emerson,* 8 A.2d at 157–58; *State ex rel. Craven v.*

### e. Conclusion

On the facts of this case, the answer to the compound first question is "No" as to part one and "Yes" as to part two.

HORSEY, Justice, dissenting:

I respectfully dissent.

This controversy arises solely because of the unwillingness of a public servant to relinquish a statutory office over which the Governor is conferred the power of appointment, notwithstanding the expiration of his appointed term and the Governor's appointment of a successor for the office. The question presented results from the Governor's exercise of his power while the Senate is in recess to make a so-called recess appointment. The appointment made granted a commission to Relator which was required to "expire at the end of the next session of the Senate."

It is self-evident that at the time of the Governor's issuance of his commission to Relator, his predecessor's term of appointment to that office had expired by some 30 months. It is also the fact that the Governor had resorted to exercise of his recess appointment power only after first submitting the Relator's name to the Senate for confirmation, pursuant to Article III, § 9. It is also the fact that the Senate did not reject the Governor's nomination; nor did the Senate take any action on the nomination over a period of nearly two years that the Senate was in session.

Thus, this is not a case of premature use or abuse by the Governor of the "special grant" of power conferred on him by Article III, § 9 to fill for a limited time vacancies in public offices occurring during the recess of the Senate.[1] Hence, it cannot be contended that the Governor, by resorting to his power to fill the 30-month vacancy in the office in question by issuing the recess commission on January 6, 1981 to Relator, has deprived the Senate of the right to perform its delegated role in the "general" appointive process. This is also not a case of a Governor delaying the exercise of his general grant of power to fill a vacancy in a public office that has occurred while the Senate was in session and until the Senate is "in recess." Nor is it the case of a Governor resorting to the use of his special power of appointment to issue a commission to a nominee who has previously been rejected by the Senate for nomination to the very same office.

I say this to dispose of non-issues as to fears of how the Governor's special recess power under Article III, § 9 might conceivably be abused by a Governor who sought to deprive the Senate of its designated role in the Governor's exercise of his general power of appointment. I also say this because I believe that the majority's concern for this potential for abuse of the recess power has led the Court to a result which does violence to the doctrine of separation of powers by weakening the Governor's ability to perform his executive function.

Where, then, lies the asserted right of Defendant Killen to hold over in this case where Defendant's successor has been appointed by grant of a commission issued by the Governor under the authority of Article III, § 9 while the Senate was concededly in recess?

The majority finds this "right" in two ways: *first*, by construing Article XV, § 5 as conferring a "*de jure* right" in an incumbent whose term has expired to hold over indefinitely, thereby giving such right preference over the Governor's special recess power to appoint a successor; and *second*, by concluding that the Governor's special power, as distinguished from his general power, under Article III, § 9, is not, in reality, a power to appoint at all, but merely a power to fill a vacancy. Hence, if there is no vacancy, there is no power; and there is no vacancy in the office held by

---

*Schorr,* Del.Supr., 131 A.2d 158, 163 (1957). These specific Delaware references are also, obviously, important in any overall constitutional policy argument.

1. *See, State ex rel Satterthwaite v. Stover,* Del. Supr., 159 A. 239 (1932).

Killen because of his "*de jure* right" to hold over—presumably indefinitely, until such time as the Governor and the Senate can agree on who should fill the office.

The reasoning is circular and the result, in this case, borders on the bizarre. Here, we have a public servant appointed for a term of four years who has the temerity or arrogance to choose to stay on indefinitely. The majority does not deal with the fact that incumbent's term of office has long since expired and that the power of the Governor to exercise his executive power of appointment is obviously being frustrated. Instead, the majority focuses, improperly I submit, on the legal standing of the holdover incumbent to resist removal rather than upon the right of the Governor to appoint a successor of his choosing.

With respect to Article III, § 9, several observations can be made. *One,* it is quite understandable that the "special" power conferred upon the Governor thereunder is expressed in terms of a power to fill "vacancies" rather than in terms of simply a power to appoint, as is the Governor's "general" power. The special power may only be exercised when the Senate is in recess. And the operative event necessary to invoke the special power is the existence of a vacancy during the recess of the Senate. The power—whether general or special—is no less a power to appoint; and a vacancy is a necessary prerequisite to the exercise of either power.

*Two,* the last sentence of Article III, § 9 could, and should, be read as stating, "He shall have the power to grant Commissions to fill all vacancies that may happen during the recess of the Senate . . . which shall expire at the end of the next session of the Senate." So read, the Governor's recess power is no less of a power to appoint than is his power to appoint while the Senate is in session. The only meaningful distinction between the two powers is the temporary nature of his recess power and the limited use that may be properly made of it.

*Three, the* Governor's recess power is a power to fill "all vacancies" happening or continuing during the recess of the Senate. The Governor's recess power is thus stated as absolutely as his power to appoint while the Senate is in session. The Governor's recess appointment power is not circumscribed by the manner in which the office becomes and remains vacant. The recess power is not limited to the filling of only such vacancies as arise by death, resignation or removal from office. Such have been termed "absolute" vacancies, *State ex rel Satterthwaite v. Stover, supra,* which may be distinguished from the "constructive" vacancy arising in this case. The latter is a vacancy resulting from expiration of the term of office prescribed by statute. The Governor's recess power necessarily, logically and expressly extends to "all vacancies." Yet the majority's holding illogically limits the recess power to "absolute" vacancies. Its holding thus permits a holdover incumbent to defeat the Governor's exercise of his special power (after the Senate declines to act upon the Governor's effort to exercise his general power) by simply refusing to vacate the office.

Turning to Article XV, § 5, it seems fair to say that simply because the section confers on an incumbent a *de jure* duty to hold over until his successor is duly qualified, that same duty cannot be converted into a *de jure right* to hold over in disregard of the fact that the incumbent's successor has been concededly appointed and qualified.

Had the Senate acted on the Governor's nomination and confirmed Relator, Defendant's authority under Article XV, § 5 to hold over would clearly have ended upon the appointment and qualification of Relator. Under no reasonable construction of Article XV, § 5 could defendant be entitled of right to hold over. How, then, can this holdover power be construed to be an inalienable "right" for one purpose but no more than a duty for another?

The majority thereby confuses rights and powers in construing Article XV, § 5 as conferring upon a holdover incumbent whose term has expired a right to remain in office superior to the Governor's power to appoint a successor.

The so-called "conflict" between Article XV, § 5 and Article III, § 9 is largely of the majority's own making. For the majority first characterizes § 5 as conferring a "*de jure* right" upon a holdover to continue in office that thereby prevails over a gubernatorial recess appointment. But the majority must also concede that the very same constitutionally conferred power to hold over is nothing more than a power, rather than a right, in the context of the Governor's appointment of a successor with the consent of the Senate.

Until now, this Court has construed Article XV, § 5 as simply conferring a power to hold over so as to permit an incumbent to serve a caretaker's role for the period between the expiration of his term and the appointment of his successor. *See, Walker v. Hughes,* Del.Supr., 36 A.2d 47 (1944), stating:

> The purpose of a holding over provision is to prevent a possible vacancy or interregnum in a public office where there is no properly qualified successor at the expiration of the usual statutory term, *so that the public business will not be interrupted or subjected to doubt or dispute.* (emphasis added).

Defendant's right to remain in office must terminate upon the Governor's proper exercise of his appointive powers under Article III, § 9. Since no contention is here made that the Governor improperly resorted to his recess power and thereby failed to comply with both the letter and spirit of Article III, § 9, Defendant's holdover right to remain in office ceased on January 6, 1981. Article XV, § 5 cannot be reasonably construed as conferring any substantive right upon Defendant to continue in office in disregard of Relator's conceded qualification to fill the vacancy in the given office on a temporary basis.

The majority's studious effort to rationalize its result through Delaware case precedent does not stand up on careful analysis. No one or combination of the Delaware authorities relied on by the majority support the holding in this case. The most that the majority can glean from Delaware case precedent is that it "clearly dictates that there is no vacancy on the mere expiration of a term." That conclusion is of no assistance in resolving the ultimate question presented: Whether defendant's conceded *de jure* right to hold over following the expiration of his appointed term of office continued beyond, or instead was terminated by, the Governor's lawful exercise of his recess power of appointment under Article III, § 9.

*Stover* contains no language that can be reasonably construed as supporting the Court's holding in this case. The distinction made in *Stover* between the Governor's general session power and his limited special recess power does not support the result reached herein—for the reasons previously stated. Indeed, Judge Rodney, in *Stover,* precisely distinguished the case before him from this case by stating, "We are not concerned with the holding over, after the expiration of a term, where the appointee had originally been regularly appointed and confirmed." (159 A. at 241). More to the point is Judge Rodney's conclusion after discussing the various kinds of vacancies that may occur in an office (original, absolute and constructive):

> It, therefore, becomes material in considering whether a vacancy existed in the office of . . . [on the date of the Governor's issuance of a recess commission to a successor to the office] to consider the *manner* of the holding of the then incumbent. . . . (159 A. at 241) (underlining added).

*Southerland v. Caulk, supra,* holds only that where a purported successor was not duly elected, the incumbent officer was entitled to hold over by virtue of Article XV, § 5. *Satterthewaite v. Highfield, supra,* did not present a question remotely relevant to the one before this Court.

The 1963 *Opinion of the Justices, supra,* concerned the terms of constitutional judges for whom special provision is made under Article IV, § 3 for their replacement whenever "a vacancy shall occur, by expira-

tion of term or otherwise." Such language indicates no more than a clear legislative intent that constitutional judges may not hold over under the authority of Article XV, § 5. This Court's advisory Opinion did not address the question in this case—whether the expiration of a statutory term of office creates a "vacancy" subject to the Governor's exercise of his recess appointment power.

So far as I know, there is no case law supporting the holding of this Court—that an officer's right to hold over beyond the expiration of his term of office is superior to the Chief Executive's right to appoint a successor by any constitutionally delegated manner.

Indeed, in the only two known instances that a Chief Executive's special recess power has been challenged by an incumbent holdover, the courts have held the recess appointment power to be superior to the incumbent's holdover rights. *State v. Young,* La.Supr., 137 La. 102, 68 So. 241 (1915); *Staebler v. Carter,* D.D.C., 464 F.Supp. 585 (1979).

In both *Young* and *Staebler,* the *ratio decidendi* of the majority in this case was rejected. Both Courts ruled that a power to hold over (in one case, conferred by constitution, in the other, by statute) must be subordinated to a Chief Executive's recess appointive power to fill an office made vacant by the expiration of an incumbent's term. In *Young,* as here, the contention was made, and rejected, by evidence of legislative intent that a vacancy in membership on the Commission was deemed to exist from the expiration of an incumbent's term of office. But the Court also concluded that even if it were to adopt the incumbent's view [as this Court has done in this case], the incumbent's holdover "rights" should not prevail over the Executive's recess appointment power under any theory or analytical approach to the question. In particular, the Court in *Staebler* found the

incumbent's argument to restrict unreasonably the Chief Executive's constitutionally conferred recess appointment authority " ... to operate only in the unusual situation when no person is available to occupy a particular office...." [2] The Court continued:

> If that interpretation is correct, the President would be prohibited from making a recess appointment when a term of office has expired, as long as someone with a permissive claim to the office is still serving.
>
> The Court is not persuaded that this was the intention of the framers of the Constitution. There is nothing to suggest that the Recess Appointments Clause was designed as some sort of extraordinary and lesser method of appointment, to be used only in cases of extreme necessity. Some constitutional provisions, such as the First Amendment, have a preferred standing, but otherwise all parts of the Constitution are of equal validity and weight and should be construed in light of the principle that the entire Constitution must be regarded as one whole. *Prout v. Starr,* 188 U.S. 537, 543–4, 23 S.Ct. 398 [400–401], 47 L.Ed. 584 (1903). The framers did not indicate that the appointment process was to be an exception to this general rule of equality, and no court has so held.[27] In the absence of persuasive evidence to the contrary, it is therefore not appropriate to assume that this Clause has a species of subordinate standing in the constitutional scheme or that it is not as operative when Congress is not in session as the Nomination and Confirmation Clause (Article II, Section 2, Clause 2) is when Congress is available.

\* \* \* \* \* \*

There is thus no evidence, semantic, historic, philosophic, or in prior practice or usage, to support plaintiff's view that the recess appointment power was intended to be restricted to instances of absolute

---

**2.** I quote at length from *Staebler* because of Judge Greene's incisive analysis of the "broader constitutional considerations" and implica-

tions underlying the question presented. (464 F.Supp. at 598).

need, *i.e.,* when no individual is available to occupy the office on any tenable basis. The more persuasive conclusion to be drawn from the available evidence is that recess appointments may validly be made during congressional recesses, and that the persons so appointed may then begin to serve, subject to the constitutional limitation that, unless confirmed, their service will terminate at the conclusion of the next session of Congress. It follows that a construction of 2 U.S.C. § 437c which would preclude the President from making a recess appointment in this situation—*i.e.,* during a Senate recess and after the statutory term of the incumbent has expired—would seriously impair his constitutional authority and should be avoided if it is possible to do so.

## VII

The same result follows from an analysis of broader constitutional considerations. This case, like *Buckley v. Valeo,* [424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659], *supra,* necessarily involves not merely the interests of the parties but also the proper distribution of power between the branches of government with respect to appointments to high office. Madison has noted that a partition of power "must be supplied by so contriving the interior structure of government as that its several constituent parts may, by their mutual relations, be the means of keeping each other in their proper places." *The Federalist No. 51* (Wesleyan ed. 1961). The Constitution must be interpreted in light of that fundamental principle of checks and balances. *Buckley v. Valeo, supra,* 424 U.S. at 120, 96 S.Ct. 612; *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863 [870], 96 L.Ed. 1153 (1952). As a necessary incident to a decision in this case a choice must be made between a construction of the Act supporting the exercise of executive authority and one which would vest greater power in the legislative branch. Given the need for such a choice, the constitutional scheme of checks and balances in this particular instance favors the claims of the executive.*

\*　　\*　　\*　　\*　　\*·　　\*

We must not forget that this power of appointment to office is essentially an executive function. It belongs essentially to the executive department rather than to the legislative or judicial.

\*　　\*　　\*　　\*　　\*　　\*

This does not mean, of course, either that Presidential power in this field is absolute—obviously it is not—or that every law dealing with appointments to office must necessarily be construed to favor the greatest possible role for the executive branch. But where, as here, there is an ambiguity,* and where, depending upon the resolution of that ambiguity the President or the Congress may achieve a stronger voice (see *infra*), it is appropriate to consider that the President was intended by the framers of the Constitution to possess the active, initiating, and preferred role with respect to the appointment of officers of the United States.

\*　　\*　　\*　　\*　　\*　　\*

. . . Under plaintiff's construction, on the other hand, it is conceivable that a member of the Commission, once appointed and confirmed, albeit for a limited term, could remain in office indefinitely notwithstanding the expiration of that term, as long as the Senate refuses to confirm any successor, or indeed, as long as a significant number of members of the Senate is able to prevent the nomination of a potential successor from coming to a vote. The President would be totally powerless by constitutional means to protect himself and the power to nominate officials conferred upon him by Art. II, Sec. 2 of the Constitution from such usurpation. Clearly, the interpretation prof-

\* Footnote omitted.

fered by plaintiff is far more unbalancing of the harmonious interplay between the branches than that of defendants (cf. *The Federalist No. 51,* pp. 323–4; *The Federalist No. 48,* pp. 308–310) and should therefore be avoided if possible.

[27] Story's view of the Recess Appointments Clause, that it applies only in cases of death, resignation, promotion, or removal (J. Story, III *Commentaries on the Constitution* 411 (reprinted ed. New York 1977) (1st ed. Boston 1833) has not been followed in practice or by the courts. See the excellent discussion in *United States v. Allocco,* 305 F.2d 704, 709–15 (2d Cir.1962), *cert. denied,* 371 U.S. 964, 83 S.Ct. 545, 9 L.Ed.2d 511 (1963).

So also does this case involve, to borrow Judge Greene's words, "not merely the interests of the parties but also the proper distribution of power between the branches of government with respect to appointments to high office," (464 F.Supp. at 598). Indeed, in this case the interests of the Relator and Defendant are far overshadowed by those of the real parties in interest, the Executive and Legislative branches of government, in the proper functioning of the Governor's constitutionally conferred recess appointment power. That power conferred by Article III, § 9 of our Constitution is, as the majority notes, apparently based on and taken from Article II, § 2 of the Federal Constitution.

Hence, the recess appointive powers conferred on the Governor are indistinguishable from those conferred on the President except to the extent of any diminishment in the Governor's recess power resulting from our Constitution's holdover clause, Article XV, § 5.

I submit: (1) that *Staebler* represents the proper approach to the question of whether Article XV, § 5 should be construed as diminishing the Executive's recess appointment power; (2) that the ultimate issue is, as found in *Staebler,* "the proper distribution of power between the [Executive and Legislative] branches of government with respect to appointments to high office" (464 F.Supp. at 598); and (3) that the majority *has become sidetracked* by its preoccupation with the conceptual problem by-passed in *Staebler* of whether any *legal* vacancy in office exists by virtue of holdover "rights" of the Defendant incumbent.

By so approaching the immediate issue of Defendant's "right" to hold over in the face of the Governor's exercise of his recess power to appoint a successor (Relator), the majority has, as *Staebler* warns, seemingly forgotten that the "power of appointment to office is essentially an executive function [and] belongs essentially to the executive department rather than to the legislative or judicial." (464 F.Supp. at 599). This Court has clearly reduced the Governor's appointive power in an area essentially belonging to the Executive branch and has increased the Legislature's role in the appointive process. The Court has thereby unnecessarily tampered with the Constitution's framework.