108 N.J. Super. 161 (1969)
260 A.2d 261
PASSAIC COUNTY BAR ASSOCIATION, A NON-PROFIT MEMBERSHIP CORPORATION OF THE STATE OF NEW JERSEY, NEWTON M. ROEMER AND WILLIAM J. MARCHESE, PLAINTIFFS,
v.
RICHARD J. HUGHES, THE GOVERNOR OF THE STATE OF NEW JERSEY, AND FRANK X. McDERMOTT, THE PRESIDENT OF THE SENATE OF THE STATE OF NEW JERSEY, AND THE MEMBERS OF THE SENATE OF THE STATE OF NEW JERSEY ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 22, 1969.
*163 Mr. Howard Stern appeared for plaintiffs (Messrs. Howard Stern, Bernard L. Albert, Joseph D.J. Gourley, Joseph Salerno, on the brief).
Mr. William S. Greenberg, Assistant Counsel to the Governor, appeared for defendant Governor Hughes (Mr. Arthur J. Sills Attorney General, attorney; Messrs. Alan J. Karcher and William S. Greenberg, on the brief).
Mr. Richard B. McGlynn argued the cause for the defendant members of the Senate (Messrs. McGlynn and McGlynn, attorneys; Mr. William E. McGlynn, of counsel).
Mr. John Givens appeared for the New Jersey State Bar Association, amicus curiae (Messrs. Parsons, Canzona, Blair and Warren, attorneys).
MOUNTAIN, J.S.C.
This suit has been brought by the Passaic County Bar Association, Newton M. Roemer, president of the Association and William J. Marchese, its immediate past president. Defendants are the Honorable Richard J. Hughes, Governor of the State of New Jersey, the Honorable Frank X. McDermott, President of the Senate of the State of New Jersey, and all other individual members of the Senate. The New Jersey State Bar Association appears as amicus curiae.
The Passaic County Bar Association is a nonprofit membership corporation, incorporated pursuant to Title 15 of the New Jersey Revised Statutes. It is composed of approximately 650 members, all of whom are attorneys of this State in good standing, practicing or residing in the County of Passaic. In summary, the complaint charges that there are a disproportionately large number of judicial vacancies in Passaic County: that these have existed for an unwarranted period of time; that as a result of the long continued failure to fill these vacancies the trial of civil law actions in the *164 county has virtually ceased; that this condition is the result of improper inaction on the part of the Governor and the Senate; that plaintiffs have standing to bring this suit to correct this condition, and that the courts have the necessary competence to grant the relief sought.
The respective roles of the Governor and Senate in the nomination and appointment of members of the judiciary is set forth in the State Constitution:
The Governor shall nominate and appoint, with the advice and consent of the Senate, the Chief Justice and Associate Justices of the Supreme Court, the Judges of the Superior Court, the Judges of the County Courts and the judges of the inferior courts with jurisdiction extending to more than one municipality. No nomination to such an office shall be sent to the Senate for confirmation until after seven days' public notice by the Governor. [N.J. Const., Art. VI, § 6, par. 1].
The facts are not in dispute. A vacancy occurred in the office of judge of the Juvenile and Domestic Relations Court on April 28, 1967. On April 2, 1969 the Governor indicated his intention to nominate a successor to this office and thereafter delivered the nomination to the Senate on April 10, 1969. On June 28, 1967 an additional County Court judgeship for Passaic County was created by act of the Legislature. On April 2, 1969 the Governor indicated his intention to fill this position and on April 10 delivered the nomination to the Senate. On September 7, 1967 a judge of the Passaic County District Court died. On April 2, 1969 an intention to nominate a successor was submitted by the Governor, as was the nomination itself on April 10. No action has been taken by the Senate with respect to any of these three nominations.
On April 21, 1969 the Governor gave notice of his intention to nominate a resident of Passaic County to fill a prospective vacancy on the Superior Court. On April 28 the nomination was made. Senate confirmation followed on May 15. The nominee took office in September 1969 and is presently sitting in Passaic County.
*165 On August 1, 1969 a judge of the Passaic County Court was mandatorily retired by reason of age. A like retirement with respect to a judge of the Superior Court now sitting in Passaic County will occur January 1, 1970. On July 30, 1969 the Governor gave public notice of his intention to nominate a judge of the Passaic County District Court to succeed the retiring County Court judge and of his further intention to fill the vacancy that would thus ensue on the county district court with a designated nominee. At the same time he expressed his intention to nominate a particular candidate to fill the anticipated Superior Court vacancy when that should occur. Nominations with respect to two of these proposals were submitted on August 6. No action has been taken by the Senate as to these nominations.
The court will judicially notice the fact that in November 1969 a further vacancy in the Passaic County Court bench occurred by reason of resignation and that this vacancy still exists.
Near the end of June 1969 the assignment judge of Passaic County, the Honorable John F. Crane, announced the suspension of the trial of civil cases in the Law Divisions of the Superior and County Courts due to the shortage of judges. The suspension became effective with the commencement of the September 1969 term of court and continues to date.
Plaintiffs contend that the suspension of the trial of civil law suits amounts to a breakdown in the mechanism of State Government; that as citizens, taxpayers and lawyers living and practicing in the county they have standing to seek to right this condition, and that the courts should afford the means.
As indicated above, there are presently no judicial vacancies with respect to which appropriate executive action has not been taken with the exception of a County Court vacancy which only came into being in November 1969 and which, for this reason, is not mentioned in the complaint. It is true, however, that the Legislature has neither confirmed nor *166 rejected any of the nominees for the vacant positions that have been submitted by the Governor. Plaintiffs attribute this inaction to the practice of senatorial courtesy, of which more will be said below.
Plaintiffs ask the court, by way of relief, to compel the Executive and Legislative Branches of the State Government to act (mandamus), to order the Senate to cease and desist from the practice of senatorial courtesy (injunction), and to define the "advice and consent" clause quoted above, determine and declare the status of pending nominations and declare the practice of senatorial courtesy to be illegal and unconstitutional (declaratory judgment).
Initially, consideration must be given to the question of justiciability. Are the issues presented and the relief sought matters which are subject to judicial resolution, or do the issues, or any of them, present "political questions" to be deemed nonjusticiable in the light of the doctrine of the separation of powers? This doctrine is set forth in our State Constitution in the following language:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution. [N.J. Const., Art. III, par. 1].
There has never really developed either a judicial or academic consensus as to the theoretical bases upon which the political question doctrine rests nor as to its scope nor as to the kind of case that will surely provoke its application. For example, compare Finkelstein, "Judicial Self-Limitation," 37 Harv. L. Rev. 338 (1924); Weston, "Political Questions," 38 Harv. L. Rev. 296 (1925); Finkelstein, "Further Notes on Judicial Self-Limitation," 39 Harv. L. Rev. 221 (1925); Scharpf, "Judicial Review and the Political Question: A Functional Analysis," 75 Yale L.J. 517 (1966); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L. *167 Ed.2d 491 (1969). It has been aptly described by Justice Brennan as "a function [of the doctrine] of the separation of powers." Baker v. Carr, supra, 369 U.S., at 210, 82 S.Ct., at 706, 7 L.Ed.2d at 682.
Underlying all discussion of the subject is a general recognition that our tripartite division of the powers of government, whether viewed at the national or state level, was intended to allocate to the political branches of government a competence, in certain areas at least, ill-defined as they may be, to reach ultimate decisions and to engage in practices that are not subject to judicial supervision or review. I am aware that proponents of the "classical theory" of judicial review may disagree with this statement as seeming to justify a privilege of self-abnegation on the part of the judiciary, the exercise of which may result in a failure to accept the obligation "to say what the law is" whenever the decision of a case requires it. This theory, which appears to impose upon the judiciary a duty of decision from which there is no escape, was adopted, it is said, by Chief Justice Marshall in Marbury v. Madison, 5 U.S. (Cranch) 137, 177-178, 2 L.Ed. 60 (1803), and is implicit, if not indeed explicit, in the doctrine of judicial review which that decision expounded. Scharpf, "Judicial Review and the Political Question: A Functional Analysis," supra, at 518. A protagonist of the classical theory, in referring to the political question doctrine, has said that "all the doctrine can defensibly imply is that the courts are called upon to judge whether the Constitution has committed to another agency of government the autonomous determination of the issue raised, a finding that itself requires an interpretation." Wechsler, "Toward Neutral Principles of Constitutional Law," 73 Harv. L. Rev. 1, 7-8 (1969). This appears to be the approach adopted by the Supreme Court in Powell v. McCormick, supra, where Chief Justice Warren observed that the court must interpret the Constitution and determine what power that document confers on the House of Representatives before the court can determine to what extent the *168 exercise of that power is subject to judicial review. 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d, at 514. From the point of view of ultimate result, it seems no great matter whether, in cases of this sort, courts be said to exercise judicial self-restraint or, through the interpretive process, arrive at the conclusion that the matter rests wholly with a coordinate branch of government.
The majority opinion in Baker v. Carr, supra, with respect to the political question doctrine, merits notice at this point. There it is said that any case held to involve a political question  and which will therefore and for that reason be nonjusticiable  will clearly present at least one of the following formulations:
"a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." 369 U.S., at 217, 82 S.Ct., at 710, 7 L.Ed.2d, at 686.
The court is here considering the political question doctrine in relation to the national government and the Federal Constitution. Admittedly, certain of the "formulations" are almost certainly directed to questions of foreign affairs, treaties and the like, with which a state government has no constitutional concern but which have very often provided the occasion for an invocation of this doctrine in the federal courts. Certain of the formulations, however, and especially the first two, seem immediately relevant to the problem we are considering at the state level.
It is necessary at this point to consider briefly the nature and history of the practice of senatorial courtesy which is really the principal target of the plaintiffs' challenge. This *169 practice, insofar as it relates to judicial appointments, may be stated as follows: If a nomination to judicial office with respect to a particular county is displeasing to one or more of the senators from that county, then the other members of the Senate will take no action looking to the confirmation of the proposed nominee and this quite apart from the nominee's qualifications or lack thereof.
Historically, the practice, in its present form at least, did not exist in New Jersey prior to the adoption of the Constitution of 1844 for the reason that prior to that time the Governor had no power of judicial appointment. The Constitution of 1776 placed this power in the Legislative Council and General Assembly, acting jointly. N.J. Const. (1776), Art. XII. Indeed the Governor himself was appointed in the same fashion, Art. VII, rather than by the electorate at large.
The Constitution of 1844 provided that all the principal judicial officers of the State should "be nominated by the governor, and appointed by him, with the advice and consent of the senate." N.J. Const. (1844), Art. VII, § 2, par. 1. It will be seen that this language is substantially like that contained in the present Constitution of 1947 and quoted above. This mode of appointment and the language in which it was cast were directly adopted from the Federal Constitution which provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint. * * * Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law * * *." U.S. Const. Art. II, § 2. A little more than half a century of federal experience lay unveiled before the members of the Constitutional Convention that met in Trenton in the spring of 1844, and unquestionably it was known and considered.
What had this experience been? In The Federalist (No. 66) Alexander Hamilton, in commenting upon the appointing power, had prophesied:
*170 It will be the office of the President to Nominate, and with the advice and consent of the Senate to Appoint. There will, of course, be no exertion of Choice on the part of the Senate. They may defeat one choice of the Executive and oblige him to make another; but they cannot themselves Choose  they can only ratify or reject the choice of the President. They might even entertain a preference to some other person, at the very moment they were assenting to the one proposed, because there might be no positive ground of opposition to him; and they could not be sure, if they withheld their consent, that the subsequent nomination would fall upon their own favorite, or upon any other person in their estimation more meritorious than the one rejected. Thus it could hardly happen that the majority of the Senate would feel any other complacency toward the object of an appointment than such as the appearance of merit might inspire, and the proofs of the want of it destroy.
History has shown this prophecy to have been almost totally in error.[1]
The first instance of senatorial courtesy occurred early in Washington's first administration. The President nominated one Benjamin Fishbourn to the post of naval officer of the port of Savannah. Despite his "excellent qualifications the Senate rejected the nomination as a courtesy to the two senators from Georgia, who had a candidate of their own. The following day Washington withdrew the nomination of Fishbourn and yielded to the two Georgia senators by nominating the candidate they desired; * * *." Harris, The Advice and Consent of the Senate 40 (1953). This practice has continued, despite recurrent executive expostulation, until the present time.[2] In general only two occasions have been deemed appropriate for the waiving of the practice of Senatorial courtesy: where the nominee is nationally recognized as exceptionally *171 outstanding or where the Senator seeking to invoke the privilege is not in the good graces of his colleagues in the Senate. cf. Harris, supra, at 219.
Following the adoption of the Constitution of 1844 in New Jersey the practice quickly became common and has been more or less followed ever since. Just as has been true at the federal level, it has been constantly decried by the Executive. In 1941 Governor Edison said of senatorial confirmation in general and of senatorial courtesy in particular, "[a] governor of New Jersey is called upon to rely in his administration of the state offices upon numerous executives over whom he does not have this basic control [the appointing and removal power]. He is certain to find that some of these men on whom he must depend worked personally, perhaps even used their departments, to prevent his election." Governor Edge is said to have held the same view but stressed that the practice was more pernicious with respect to county than to state-wide nominees.[3]
In an address delivered before the Essex County Bar Association in April 1965 (and which has been filed as an appendix to plaintiffs' brief) Governor Hughes took sharp issue with this practice. At that time there were unfilled vacancies in Essex County for which the Governor had proposed nominees. He described the increasing backlog of cases as a hardship to the citizens of the entire State that was directly attributable to "a tradition known as senatorial courtesy, which is certainly being grossly abused in New Jersey today." The Governor added, "[i]t is bad enough that a Senator may say for no valid reason who shall not be a judge. It is inexcusable that a Senator should attempt to dictate who the judge shall be." He described the rule as it actually operates.
Here is how it works  a vacancy occurs or a new judgeship is created. The Governor, after exhaustive consultation and careful consideration, *172 sends to the Senate the name of the individual he deems most qualified by temperament and professional ability to occupy that judgeship. The nomination is referred to the Judiciary Committee for study and evaluation. The nominee's home county Senator, who may or may not be a member of the committee, then announces that he will not move the appointment and thereby, under the tradition of senatorial courtesy, forecloses indefinitely any consideration by the committee on the merits of the nomination.
With this brief word as background, we return to the principal issued posed: may this practice, privilege, tradition  call it what you will  of senatorial courtesy be judicially examined and its constitutionality determined by this court, or is it immune from such scrutiny and judicial evaluation under the political question doctrine discussed above? In my opinion, as presented to this court in this case, the issue is nonjusticiable.
In Kligerman v. Lynch, 92 N.J. Super. 373 (Ch. Div. 1966) cert. den. 389 U.S. 822, 88 S.Ct. 49, 19 L.Ed.2d 74 (1967), Judge Wick had occasion to consider this precise issue. He there observed:
Plaintiffs contend that rejection of qualified nominees for personal reasons is so arbitrary as to be incompatible with the power vested in the Senate, and that the framers of the Constitution never intended this check on the appointive power to supplant a properly exercised executive function.
While this court must agree with plaintiffs that the constitutional draftsmen never intended the advice and consent clause to be so used, it cannot agree that it has the power to rectify the situation. [at 375]
The decision of the court that the practice of senatorial courtesy presented a nonjusticiable issue was rested in large part upon a finding that it was not the intention of the framers of the Constitutions of 1844 and 1947 to invest the courts with power to supervise the Legislature's internal procedures where these are not spelled out in the Constitution. With this I agree. Furthermore, there may be added, as additional grounds for reaching the same result, the first two of the "formulations" set forth by Justice *173 Brennan in Baker v. Carr, supra, and quoted above. There is here "a textually demonstrable constitutional commitment of the issue" to the coordinate political branches of government. The Governor (Executive) is authorized to nominate and appoint. The Senate (Legislative) is to advise and, before the appointment may be finally made, to consent. Here is a clear commitment derived from the text of the Constitution itself. N.J. Const. (1947), Art. VI, § 6, par. 1. In Powell v. McCormack, supra, it was held that an internal matter (determination of membership) in a legislative body (House of Representatives) was reviewable by the court, but there the specific qualifications for membership were themselves set forth in the Constitution. In asserting and exercising its right to review, the court did no more than establish the exclusive nature of the particular qualifications for membership in the House that the Constitution enumerated. There are no similarly express constitutional directions as to the precise manner in which the Executive and Legislative Branches are to undertake their responsibility of making appointments. No standards to guide judicial action are supplied; in Powell they are explicit.
Thus, there is also "a lack of judicially discoverable and manageable standards" for resolving the issue. How is a judicial inquiry to be undertaken to find out whether, in fact, inaction on the part of the Senate results from a deference to the tradition and practice of senatorial courtesy or from some other cause? Are senators to be interrogated as to the reasons and motivations for their actions or their inactions?
For these various reasons the court concludes that whether the practice of senatorial courtesy is or is not constitutional, at least as the point arises here, it is a nonjusticiable issue which the court should not undertake to resolve. Whether the practice is to be longer sanctioned or finally condemned must be determined at the bar of public opinion.
*174 Specific relief is also sought against the Governor. It must be denied for several reasons. In the first place, in the exercise of the appointing power the Executive Branch of the State Government is immune from judicial supervision to the same extent and for the same reasons as is the Legislative Branch. The reasons are set forth above and apply equally to each of the political branches of government in the exercise  or seeming nonexercise  of this constitutionally delegated authority. Secondly, the relief sought would require the court to issue a writ of mandamus or an order or judgment closely akin thereto. Such a judicial directive will not issue against the Chief Executive. In the third place, the issue is moot, or perhaps more accurately, no case or controversy is projected.
As to the question of mandamus, we do not need to look beyond a leading decision of our own courts. State v. Governor, 25 N.J.L. 331 (Sup. Ct. 1856). In that case William Gledhill claimed to have been elected surrogate of Passaic County and sought a writ of mandamus to compel Governor Price to issue his commission. The court denied the relief sought
* * * upon the broad ground that this court has no power to award a mandamus, either to compel the execution of any duty enjoined on the executive by the constitution, or to direct the manner of its performance. The exercise of such power would be an unwarrantable interference with the action of the executive within his appropriate sphere of duty. The constitution has divided the powers of government into distinct departments, and cautiously provided for their independent exericse. It has expressly forbidden any person belonging to, or constituting one of these departments, from exercising any of the powers properly belonging to either of the others, except as expressly provided in the constitution itself. [at 349-350].
Plaintiffs' argument that the granting of the commission was merely a ministerial act and might therefore be ordered by the court was likewise rejected upon the ground that whether ministerial or discretionary, it was nontheless an executive act and as such beyond the reach of judicial supervision. We have before us a much stronger case for *175 the denial of relief, an exercise of the appointing power being highly discretionary. More recent pronouncements to the same effect include Cole v. Corio, 105 N.J.L. 511, 513 (Sup. Ct. 1929); Prudential Ins. Co. of America v. Clifton, etc. Co., 109 N.J. Eq. 349, 350 (Ch. 1931); Driscoll v. Sakin, 121 N.J.L. 225 (Sup. Ct. 1938); Allan v. Durand, 137 N.J.L. 30 (Sup. Ct. 1948).
Finally, there is really no controversy as to this issue before the court. At the time the suit was started Governor Hughes had taken appropriate action with respect to all existing vacancies.
Plaintiffs project one further argument which should be considered. Art. V, § 1, par. 13 of our State Constitution authorizes, but does not require, the Governor to make an ad interim appointment to "fill any vacancy occurring in any office during a recess of the Legislature." I withhold any determination as to whether there is or has been a "recess of the Legislature." Suffice it to say that for reasons given above the court would in no event have the competence to direct the Executive to exercise the power of ad interim appointment conferred by this paragraph of the Constitution, assuming such recess to exist.
The argument seems to go further and to suggest that the nominations presently before the Senate are no longer viable. I cannot read this constitutional provision to support such a result.
The court has purposely refrained from passing upon the question as to whether plaintiffs do or do not have standing in respect of any of the particular issues raised, having preferred to treat the case in the manner set forth above.
Counsel may submit a form of judgment reflecting the conclusion reached.
NOTES
[1] More than a century after Hamilton's prophecy, ex-President Taft is quoted as having said that "[t]he appointing power is in effect in their (the Senators') hands, subject only to a veto by the President." 2 Haynes, The Senate of the United States 736 (1938).
[2] "The Senate * * * when loath openly to reject a nomination, has often taken no action upon it, or after long delay, has voted to postpone its consideration indefinitely. At least ten nominations to the Supreme Court have been blocked in this way." 2 Haynes, The Senate of the United States 770 (1938).
[3] Mazur, Senatorial Confirmation Procedure in American State Governments 4 (1950), (Unpublished thesis, Library of University of California.)