**STATE of Delaware, on the Relation of Charles M. OBERLY, III, Attorney General of the State of Delaware, Plaintiff Below, Appellant,**

v.

**Edward J. TROISE, Sr., Francis A. DiMondi, and Robert S. Powell, Defendants Below, Appellees.**

Supreme Court of Delaware.

Submitted: Feb. 24, 1987.
Decided: June 4, 1987.

Bruce M. Stargatt (argued), and C. Vincent Scheel, of Young, Conaway, Stargatt & Taylor, Wilmington, and Fred S. Silverman, State Sol., and Barbara MacDonald, Deputy Atty. Gen., Dept. of Justice, Wilmington, for plaintiff below appellant.

William E. Manning (argued), of Duane, Morris & Heckscher, Wilmington, for defendant below appellee DiMondi.

Richard D. Kirk, of Morris, James, Hitchens & Williams, Wilmington, for defendants below appellees Troise and Powell.

Before CHRISTIE, C.J., HORSEY, MOORE and WALSH, JJ., constituting the Court en banc.

CHRISTIE, Chief Justice:

Article III, § 9 of the Delaware constitution conditions the Governor's power to appoint certain public officials on "the consent of a majority of all the members elected to the Senate." This case presents the question whether the Senate's prolonged failure to act on gubernatorial nominations is to be deemed constructive consent thereto, thereby constitutionally authorizing the Governor to issue valid full-term commissions to his nominees. In a recent decision of this Court, *State ex rel. Gebelein v. Killen*, Del.Supr., 454 A.2d 737 (1982), this Court raised the possibility that such a result might ensue.

The question is now squarely before the Court by way of a *quo warranto* action brought by the State, here appellant, challenging the validity of three commissions issued by the former Governor Pierre S. DuPont, IV to appellees Francis A. DiMondi, Edward J. Troise, and Robert S. Powell. These commissions were issued without having received the affirmative consent of the Senate. Before the commissions were issued, the nominations of appellees had been before the Senate and held in committee for periods ranging from approximately one to two years. We conclude that the plain language of article III, § 9 and the relevant constitutional history leave no room for the application of the suggested judicial remedy of constructive consent, and therefore we rule that the commissions are invalid.

I.

The events leading up to the issuance of the challenged commissions involve attempts by the Governor to exercise two distinct types of appointment power provided by article III, § 9. The first sentence of § 9 sets forth what may be called the "regular" appointment power:

He [the Governor] shall have power, unless herein otherwise provided, to appoint, by and with the consent of a majority of all the members elected to the Senate, such officers as he is or may be authorized by this Constitution or by law to appoint.

The exercise of this power depends on Senate consent and results in the issuance of full-term commissions. Section 9 continues:

He shall have power to fill all vacancies that may happen during the recess of the Senate, in offices to which he may appoint, except in the offices of the Chancellor, Chief Justice and Associate

Judges, by granting Commissions which shall expire at the end of the next session of the Senate.

This language sets forth the "recess" appointment power, by which the Governor may make appointments without the Senate's consent to fill vacancies existing during a recess of the Senate. Under his recess appointment power, the Governor can issue only "interim" or "recess" commissions which expire at the end of the next session of the Senate. The case before us concerns the Governor's regular appointment power, not his power to make interim or recess appointments.

On January 10, 1979, then Governor DuPont submitted to the Senate of the 130th General Assembly, pursuant to his regular appointment power, the nomination of appellee DiMondi to the Delaware River and Bay Authority ("DRBA"). The Senate took no action on DiMondi's nomination before that Senate went out of existence in November of 1980.

On January 6, 1981, during a recess between the 130th and 131st General Assemblies, Governor DuPont issued to DiMondi under the recess appointment power an interim commission for a limited term for the office occupied by Ernest Killen as a "holdover" incumbent under article XV, § 5 of the State constitution.[1] Killen challenged DiMondi's interim appointment, and in the *Killen* decision, dated December 20, 1982, a majority of this Court held that the recess power conferred by article III, § 9 (second sentence) "was not intended to be exercised for an office occupied by a holdover appointee," 454 A.2d at 747, by operation of article XV, § 5. *Id.* at 749, 751. Governor DuPont then nominated Killen for reappointment to the DRBA and the Senate of the 131st General Assembly confirmed that nomination. However, Killen died in December 1983 shortly after Governor DuPont issued to him a second full-term commission.

On January 11, 1984, Governor DuPont again attempted to obtain a full-term commission for DiMondi by nominating him to fill Killen's now vacant seat on the DRBA. The Senate Executive Committee of the 132nd General Assembly held a confirmation hearing on the nomination in January 1984, but took no further action on it before the 132nd General Assembly went out of existence in November 1984.

On January 6, 1983, during the recess between the 131st and 132nd General Assemblies, Governor DuPont issued recess commissions appointing appellee Troise to fill a vacancy on the Alcoholic Beverage Control Commission ("ABCC") and appointing appellee Powell to fill a vacancy on the Industrial Accident Board ("IAB"). On January 20, 1983, nine days after the Senate of the 132nd General Assembly convened, the Governor sent to the Senate his nominations of Troise and Powell for full-term regular appointments to the respective offices. The Senate Executive Committee held confirmation hearings on these nominations in March 1983, but the Senate took no further action on them before it went out of existence in November 1984.

On December 13, 1984, before the convening of the newly elected 133rd General Assembly, Governor DuPont issued what purported to be full-term commissions to DiMondi, Troise, and Powell under his *regular* appointment power. The Governor did not obtain the actual consent of the majority of the members of the Senate of the 132nd General Assembly, nor did he submit the nominations of the three men to the Senate of the 133rd General Assembly which convened the following January. Instead he apparently relied on the following language in the *Killen* decision:

> The constitutional duty of the Senate to act on gubernatorial nominations seems clear. And, notwithstanding the absence of precedent and the failure of oral argument in this case to suggest an enforcement mechanism, we are not called upon to foreclose and we do not foreclose the possibility that the judicial branch has the power to enforce the duty, at least on a case by case basis, when the claim is promptly made and diligently pursued.

1. Article XV, § 5 states: "All public officers shall hold their respective offices until their successors shall be duly qualified, except in cases herein otherwise provided."

For example, one remedy that could be considered in a given case, would be that the Senate's willful and prolonged avoidance of its constitutional duty to confirm a qualified nominee may be deemed an assent to the nomination and the equivalent of a confirmation.

454 A.2d at 744 (footnote and citations omitted).

DiMondi's commission, by its terms, appoints him a member of the DRBA for the deceased Killen's unexpired term ending July 1, 1988. Troise's commission appoints him a member of the ABCC for three years. Powell's appoints him a member of the IAB for six years.

The State Attorney General's Office brought this action in Superior Court to test the validity of these full-term commissions. The Superior Court sought certification of the question to this Court, but this Court refused certification and directed the parties to develop an appropriate record for decision by the Superior Court. The parties then stipulated to the facts recited above. In its decision on motions by all parties for summary judgment, the Superior Court expressed serious reservations about the validity of the commissions but ruled that it was bound to uphold the actions of the Governor in light of the above-quoted language in the *Killen* decision.[2]

On appeal to this Court, the State argues as a threshold matter that the *Killen* decision leaves open the question of the Governor's power to issue full-term commissions without the Senate's actual consent. The State relies on the plain language of article III, § 9 and of the statutory provisions governing appointment to the DRBA, ABCC, and IAB, in arguing that the com-

missions are invalid. The State also contends that the granting of a judicial remedy for senatorial inaction would violate the doctrine of separation of powers.

Appellees contend that the *Killen dicta* was as clear an indication as this Court could give of how it would deal with a specific case presenting prolonged senatorial inaction. They assert that article III, § 9 implicitly imposed upon the Senate a duty to act on gubernatorial nominations and that the Senate's failure to do so should be deemed constructive consent to the nominations, thereby constitutionally authorizing the issuance of regular commissions for a full term of office under article III, § 9.

## II.

The *Killen* decision concerned the question whether the Governor could replace a holdover incumbent whose statutory term of office had expired with a recess appointee. Before deciding this issue, the *Killen* court noted that the controversy "puts the Judiciary in the middle between the Executive and the Legislative branches in a situation where there is a potential for abuse on both sides."[3] 454 A.2d at 743. It then discussed what it considered to be the duties of both branches. It was in this context that the *Killen* court stated it would "not foreclose the possibility" of a judicial remedy and mentioned in particular that "one remedy that could be considered" would be the application of the doctrine of constructive consent. *Id.* at 744.

Although the *Killen dicta* might be interpreted as suggesting and then approving of such a remedy, the Court was care-

**2.** The Superior Court stated:
The Governor followed a suggestion of the Supreme Court. Whether the wilful failure of the Senate to act on a nomination may be considered consent by the Senate should be a matter for the Court that exampled that course of action as a possible solution to a vexing problem. I am not convinced that I should overrule such a recent suggestion by the Supreme Court.

**3.** The Court explained:
On the one side, if the Governor can use his recess appointment power notwithstanding

the holdover provision, he could be tempted to avoid the Senate altogether by making appointments only during the recess of the Senate. Such action on his part would be an avoidance of a duty to respect the Senate's constitutional prerogatives and an abuse of power. On the other hand, given a holdover more acceptable to the Senate than the nominee of the Governor, the Senate can avoid its responsibility, as it did in this very case, by taking no action on the nominee. Such a course is also an abuse of power.
454 A.2d at 743.

ful to note that the claim before it did not concern "the behavior of the Senate" and that its decision could not "cover the entire spectrum of duties, rights and remedies." *Id.* at 745. Strictly speaking, the Court did no more than "not foreclose the possibility" of a judicial remedy for senatorial inaction. It simply raised a question which we are now called on to resolve.

### III.

### A.

The plain language of article III, § 9 and of the pertinent statutes creating the DRBA, the ABCC, and the IAB, indicate that the commissions for full terms of office are invalid since they lack the senatorial consent required by both the constitution and the statutes. As explained above, the regular appointment power set forth in article III, § 9 permits the Governor "to appoint, *by and with the consent of a majority of all the members elected to the Senate,* such officers as he is or may be authorized by this Constitution or by law to appoint." (emphasis added) Authorization to appoint to the particular offices at issue is provided by statute which also requires that the Senate consent. Commissioners of the DRBA are "appointed by the Governor with the advice and consent of the Senate," 17 *Del.C.* § 1711; members of the ABCC are "appointed by the Governor by and with the consent of a majority of the members elected to the Senate," 4 *Del.C.* § 301(b); and members of the IAB are "appointed by the Governor ... and confirmed by the Senate," 19 *Del.C.* § 2101.

Generally, resort to constitutional history or construction is not appropriate where the language of the constitution is clear and unequivocal. *Marker v. State,* Del. Supr., 450 A.2d 397, 399, n. 3 (1982); *Opinion of the Justices,* Del.Supr., 290 A.2d 645 (1972). Constitutional phrases must, if possible, be given their ordinary or plain meaning. *Marker,* 450 A.2d at 399. Courts are called upon to construe the language of the constitution only when it is in some way obscure or doubtful in its meaning. *Id.;*

*Opinion of the Justices,* 290 A.2d 645; *See Giuricich v. Emtrol Corp.,* Del.Supr., 449 A.2d 232, 238 (1982) (dealing with statutory construction). Nevertheless, in light of the concerns expressed by this Court in *Killen,* we deem it advisable to consider whether the Delaware constitutional debates offer evidence which might support action by this Court to apply a judicial remedy inconsistent with the ordinary meaning of the express language of article III, § 9.[4]

The consent provisions in our current constitution represent a deliberate decision by the constitutional convention to curb the Governor's appointment power, which had previously been unfettered. *State v. Schorr,* Del.Supr., 131 A.2d 158, 163–164 (1957). Delegate Ezekial W. Cooper explained the purpose of the consent provisions in connection with the provision dealing with the Senate's confirmation of the Secretary of State, now article III, § 10:

> Now I submit that this clause is only intended to put a check upon the Governor. That is all. It is only to make the Governor feel that with this check he must be a little more careful in the selection of his Secretary of State.

> I have heard it said by eminent members of the legal profession that some judges are a great deal better when they have their action reviewed by another court than they are where they are the sole and last resort court.

> This is a very common thing in humanity, and if we put this simple check upon the Governor, that this man (Secretary of State) must be confirmed by the Senate, why that makes him a little cautious in the selection of the man to fill that position.

IV *Debates and Proceedings of the Constitutional Convention of the State of Delaware,* at 2725 (1958) (hereinafter *Debates* ).

Speaking about the recess appointment power in article III, § 9, delegate William C. Spruance stated "it is his [the Governor's] duty at that session [the next session after the recess] to nominate and the Sen-

---

4. For the same reason we also elect to go directly to the constitutional issue despite the presence of a seemingly clear statutory ground for decision. *Cf. Killen,* 454 A.2d at 752.

ate to confirm the appointment." II *Debates* at 1902; *Killen*, 454 A.2d at 744, n. 6. However, he did not state whether such duty could be judicially enforced. Instead, during the discussion of article III, §§ 9 and 10, he stressed that in other states the confirmation requirement presented "no difficulty," II *Debates* at 1899, and that "there was seldom any friction between the Executive and the Senate in the confirmation." IV *Debates* at 2726.

Several delegates seemed to be troubled by the possibility that the Senate could stymie the Governor and in effect control the selection process by refusing to confirm nominations. Delegate Wilson J. Cavender called attention to such a danger in expressing his support for a proposed amendment to strike the clause requiring Senate confirmation for appointments to the position of Secretary of State. In response to Spruance's statement that there was "seldom any friction," Cavender argued:

> Suppose that a majority of the senate— and it is not impossible that that thing might be so—may be of an adverse political party to that of the Governor. They may very readily give to the Governor to understand that if Mr. A. is thought of for Secretary of State that he cannot receive confirmation by the Senate. And don't you see also that it puts it within the power of the majority of the Senate, as it were to select a member of the Board of Pardons [The Secretary of State is also a member of the Board of Pardons, Del. Const. art. VII, § 2] in having that controlling voice?

IV *Debates* at 2726. Following this debate, the proposed amendment was defeated by a vote of yeas 9, nays 15. IV *Debates* at 2727.

It is also worth noting that inaction by the United States Senate on nominations by the President was not unheard of at the time the delegates were deliberating on article III, § 9. One scholar has written,

with reference to several 19th century incidents of senatorial inaction:

> The Senate, on its part, when loath openly to reject a nomination, has often taken no action upon it, or after long delay, has voted to postpone its consideration indefinitely. [Footnote reproduced below] ... When Jackson first nominated Taney for the Supreme Court, the Senate held the nomination for more than six weeks, and then late at night, on the third of March, voted its indefinite postponement.
> [Footnote] This policy of delay has often been followed with great persistence and effectiveness in the closing months of an administration. The Senate refused to act upon 38 of John Quincy Adams' nominations, in order that the choices might be made by Jackson.... At the end of Tyler's administration the hostile Senate refused to act upon his last nominations.

II Haynes, *The Senate of the United States*, 769–770 (1938). The delegates, men of wisdom and experience, looked to the United States Constitution and constitutions of other states for guidance in the course of their work. *See* IV *Debates* at 2724. It may be presumed that they were aware of the practice of senatorial inaction at the federal level.

Appellees contend that comparisons to federal practice are misleading because, under federal law, the President may unseat a holdover by exercise of his interim or recess appointment power. *Staebler v. Carter*, 464 F.Supp. 585 (D.D.C.1979). Under the ruling in *Killen*, the Governor does not have a similar option. Appellees point out that the State Senate may, absent some constitutional constraint, frustrate the appointment process by inaction, thus raising the unseemly spectre of public officials holding over virtually in perpetuity against the wishes of later-elected governors.[5]

We agree with the appellees that the constitutional draftsmen never intended the consent provision to be so used. However, the constitutional history shows that the delegates were aware of the danger that

---

5. Although the challenged commissions in this case concern vacant offices, not offices occupied by holdover incumbents, the situation appellees describe is in fact similar to the circumstances that gave rise to the *Killen* case.

the Senate could, in effect, "select" officers by virtue of its having a "controlling voice" in the fate of the Governor's nominations. Despite their awareness of the potential for abuse, there is no evidence to indicate that the delegates intended that the judiciary would have the power to force the Senate to act by declaring inaction to be the equivalent of consent. Under the circumstances, we cannot say that article III, § 9 invests the judiciary with power to decree the suggested remedy for senatorial inaction.

### B.

This conclusion is consistent with the doctrine of the separation of powers, which is deeply ingrained in the jurisprudence of the State and of the nation. Broadly stated, the doctrine stands for the proposition that the coordinate branches of government perform different functions and that one branch is not to encroach on the function of the others. *Trustees of New Castle Common v. Gordy,* Del.Supr., 93 A.2d 509, 517 (1952). Separation of powers is intended to make the three separate departments of government independent within the scope of their constitutionally conferred fields of activity, *DuPont v. DuPont,* Del. Supr., 85 A.2d 724, 728 (1951), "subject to any constitutional restrictions, whether express or necessarily implied." *DuPont v. Director of the Div. of Revenue, Dep't of Fin.,* Del.Supr., 347 A.2d 653, 657 (1975). "Each of the three branches has been assigned certain powers and must respect the power given to the other two branches." *State ex rel. Tate v. Cubbage,* Del.Super., 210 A.2d 555, 564 (1965).

In order to avoid judicial encroachment on the prerogatives of the other branches of government, courts have ruled that cases involving "political questions" are for that reason nonjusticiable. *E.g., Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). As set forth in the majority opinion in *Baker v. Carr,* such cases will clearly present at least one of the following formulations:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicial-

ly discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710.

In *Passaic County Bar Association v. Hughes,* N.J.Super. Ct.Ch.Div., 108 N.J.Super. 161, 260 A.2d 261 (1969), a New Jersey court found the first two formulations particularly relevant in ruling nonjusticiable a suit brought to remedy abuse of the constitutional confirmation power in that state. The suit concerned the practice of "senatorial courtesy" by which the State Senate would refuse to confirm a nominee to judicial office in a particular county if the nominee was displeasing to one or more of the senators from that county. 260 A.2d at 265. This practice had resulted in a number of longstanding judicial vacancies and had delayed the processing of cases. Plaintiffs, including the bar association from the county involved, sought a writ of mandamus to compel the senate to act on the pending nominations and an injunction against continued practice of senatorial courtesy.

While the court agreed that the constitutional draftsmen never intended the advice and consent clause to be so used, it could not agree that it had the power to rectify the situation. 260 A.2d at 267. Its ruling rested in part on a finding that "it was not the intention of the framers ... to invest the courts with power to supervise the Legislature's internal procedures where these are not spelled out in the Constitution." *Id.* The court also noted that the case was nonjusticiable under the test of *Baker v. Carr* because the State constitution had made a "clear commitment" of the consent power to the legislative branch, and because there was a lack of "judicially

discoverable manageable standards for resolving the issue." *Id.* at 267–268.[6]

More recently, in *Pellegrino v. O'Neill,* Conn.Supr., 193 Conn. 670, 480 A.2d 476 (1984), the Supreme Court of Connecticut relied on these same factors in ruling non-justiciable a suit based on a perceived shortage of trial judges in civil cases. The action, based on the right to "justice without delay" as set forth in Connecticut's constitution, sought a declaratory judgment which in effect would have required the legislature to create additional judgeships. A plurality of the court noted a "textually demonstrable commitment of the determination of the number and the appointment of judges to the legislature." 480 A.2d at 482. It also found "there was a 'lack of judicially discoverable and manageable standards' for resolving the issues presented ... in the sense that no effective relief can be granted by a court 'without expressing lack of the respect due coordinate branches of government.'" *Id.* (quoting *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710). The court emphasized that it could not mandate performance of a constitutional duty by a legislature, noting: "[i]n all human contrivances confidence must be reposed somewhere, and ... under the distribution of powers ... in our State, it is not given to the judiciary to *compel* action on the part of a coordinate branch of the government." *Id.* 480 A.2d at 483 (quoting *Watkins v. Watkins,* 2 Md. 341, 356 (1852)).

Unlike *Passaic* and *Pellegrino,* the case before us turns on the meaning of a constitutional provision and thus presents a justiciable issue. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803). However, these New Jersey and Connecticut cases and the Delaware authority cited above demonstrate that the basic organization of state government as set out in our constitutions argues strongly against the construction of article III, § 9 which appellees urge us to adopt.

Article III, § 9 clearly assigns the confirmation power to the Senate and to no other body. Appellees point out that the Senate is not acting in its legislative capacity in exercising its confirmation power. However, we see no justification for placing judicial limitations on the Senate's authority even though it has failed to act on a non-legislative duty assigned it by the State constitution. In acting (or choosing not to act) on nominations, the Senate represents a coordinate branch of government to which the constitution has assigned a task consistent with a constitutional pattern of "checks and balances." The Senate's action, or inaction, on gubernatorial appointments rests on its constitutional authority to confirm gubernatorial appointments and even if, arguendo, such power is deemed administrative, it is not a ministerial duty which can be judicially enforced.

Moreover, there is a lack of judicially discoverable or manageable standards which would define the conditions under which the proposed remedy would be available. Courts would be forced to determine at what point senatorial inaction became sufficiently "prolonged" to be deemed consent. This would require examination of the many circumstances which might surround a delay, such as the amount of work before the Senate and the priorities placed on different projects, and even whether the Senate and the Governor have attempted a good faith resolution of their differences. Such an inquiry would put courts in the position of determining and passing upon the Senate's choices and motives, entangle the judiciary in a political thicket, and might ultimately indicate a "lack of the respect due coordinate branches of government." *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710.

---

6. *See also Gilbert v. Gladden,* N.J.Supr., 87 N.J. 275, 432 A.2d 1351 (1981), which dealt with a challenge to the New Jersey practice of gubernatorial courtesy, whereby the legislature would not present bills to the Governor until he requested them. The New Jersey Supreme Court found this question nonjusticiable as well.

In its *Killen dicta,* this Court acknowledged that both *Passaic* and *Gilbert* support the view now taken. 454 A.2d at 744.

### C.

We also note that appellees have cited no decisions wherein a court has held that Senate inaction on a Governor's nomination results in constructive consent thereto. Indeed, the decisions on similar issues are to the contrary. For example, in *State ex rel. McCarthy v. Watson*, Conn.Supr., 132 Conn. 518, 45 A.2d 716 (1946), the Connecticut Supreme Court of Errors rejected the argument that the State Senate's failure to act on a nomination resulted in a *de jure* vacancy which permitted the Governor to appoint an interim appointee and oust a holdover incumbent. The court agreed that the Senate had a "definite obligation" to act on nominations,[7] but ruled that "there can be no waiver of that duty so that inaction would be the equivalent of a tacit approval of an appointment." 45 A.2d at 724; *see also Bell v. Sampson*, Ky.App., 232 Ky. 376, 23 S.W.2d 575, 581 (1930).

\*   \*   \*

We conclude that article III, § 9 of the State constitution does not provide for a judicial remedy for prolonged senatorial inaction on nominations submitted to the Senate by the Governor, nor can authority for the suggested remedy be implied from any language in the constitution or from any other source. We must, therefore, disavow the remedy this Court suggested in the *Killen* case and rule that the commissions in question are invalid. The decision of the Superior Court is reversed.

---

**7.** The statute at issue provided that the Senate "shall act finally upon each nomination ... within ten session days from the date on which such nomination shall have been communicated to it by the governor." *Id.* at 718.